# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IQ MANAGEMENT, LLC | ) CASE NO.:   1:13-cv-10539 |
| | ) |
| Plaintiff, | ) COMPLAINT FOR: |
| vs. | ) |
| | ) 1. Securities Fraud under Rule 10(b)-5; |
| BOMBER, LLC, a Delaware limited Liability | ) 2. Controlling Person Liability; |
| Company; ROSS ANAPOLLE, an individual; | ) 3. Rescission; |
| and DOES 1 through 10 inclusive, | ) 4. Breach of Fiduciary Duty; |
| | ) 5. Common law Fraud; |
| Defendants. | ) 6. Declaratory Judgment; and |
| | ) 7. Constructive Trust |

**JURY TRIAL REQUESTED**

COMES NOW, IQ Management, LLC, by and through counsel of record, and herein states

its causes of action and claims for relief against Bomber, LLC and Ross Anapolle as follows:

### INTRODUCTION

1.      Plaintiff IQ Management, LLC was fraudulently induced to purchase five percent of

the membership interests in Bomber, LLC, a company allegedly producing high-end co-branded

skis and doing business in Boston, Massachusetts, for $150,000, with a commitment to invest

another $150,000 for an additional five percent of the membership interests in Bomber.

Unbeknownst to IQ Management, Anapolle filed a personal Chapter 7 bankruptcy only six weeks

earlier in the United States Bankruptcy Court for the District of Massachusetts, Case No.

12-16381.  In addition to failing to disclose that Bomber's Manager and owner of 90% of the membership interests in Bomber had filed bankruptcy, Anapolle also failed to disclose that he owed the Internal Revenue Service had over $1 million in back taxes, and had numerous other large personal debts that substantially exceeded both his personal assets and his income.  In fact, Anapolle grossly misrepresented the extent of sales and revenues earned by Bomber and failed to disclose that he was using Bomber to pay all of his personal expenses.  Had IQ Management known these true facts, IQ Management never would have purchased any membership interests in Bomber.  Moreover, because of the pre-existing but undisclosed bankruptcy petition, it appears that Anapolle may not even have had title to the membership interests "sold" to IQ Management. Accordingly, IQ Management not only seeks damages from the fraudulent representations and omissions, but also seeks to rescind its agreement to purchase the membership interests in Bomber, and a declaratory judgment that Anapolle, by virtue of his bankruptcy, has been deemed to have withdrawn as a member from Bomber, LLC pursuant to Bomber's Amended and Restated Operating Agreement, and terminated as the Manager for Bomber.

**PARTIES**

2.     Plaintiff, IQ Management, LLC,  is a Florida limited liability company with a usual place of business in Miami Beach, Miami-Dade County, Florida and domiciled in the State of Florida.  IQ Management is, as of October 9, 2012, the owner of 5.2632% of the membership interests in Bomber, LLC.

3.     Defendant, Bomber, LLC ("Bomber") is a Delaware limited liability company with a usual place of business in Boston, Suffolk County, Massachusetts and is a citizen of Massachusetts.

4.      Defendant Ross Anapolle is an individual domiciled in Newton, Massachusetts and is the former owner of 95% of the membership interests in defendant Bomber, and was, until February 5, 2013, its Manager. Anapolle personally controlled Bomber at all times through February 12, 2013.

5.      Does 1 through 10 are sued herein under fictitious names.  Their true names and capacities, whether individual, corporate or otherwise, are unknown to plaintiff.  When their true names and capacities are ascertained, plaintiff will amend this Complaint by inserting their names and capacities.  Plaintiff is informed and believes, and on that basis alleges, each of the fictitiously named defendants is responsible in some way for the occurrences herein alleged, and those defendants proximately caused plaintiff's damages.  Each reference in this Complaint to "defendant," "defendants," or a specifically named defendant refers to all defendants sued under fictitious names.

6.      Unless otherwise alleged, whenever reference is made in this Complaint to any act of "defendant," "defendants," or a specifically named defendant, such allegation shall mean that each defendant acted individually and jointly with the other defendant named in the Complaint.

7.      Unless otherwise alleged, any reference to any act or omission of any corporate defendant shall mean that such corporation or other business defendant did the acts or omissions alleged in this Complaint through its officers, directors, employees, agents, and/or representatives while acting within the actual or apparent scope of their authority.

8.      At all relevant times alleged herein, each of the defendants has acted as an agent, representative, assistant, or aide of each of the other defendant and has acted within the course and scope of said agency.

## JURISDICTION AND VENUE

9.      This Court has federal question jurisdiction over the subject matter of this action

pursuant to 28 U.S.C. §§ 1331 in that Plaintiff alleges violations of in violation of sections 10(b)

and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) (2012), and associated

regulations, 17 C.F.R. § 240.10b-5 (2012).

10.     This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332 in that

Plaintiff and both defendants are domiciliaries of different states, and the amount in controversy is

in excess of $150,000, exclusive of interest and attorney's fees.

11.     This Court also has supplemental jurisdiction over the state law claims by virtue of

28 U.S.C. § 1367.

12.     Venue is proper in this Court pursuant as both Defendants are domiciled and have a

usual place of business in this District and many of the misrepresentations and omissions occurred

in this District, and IQ Management's purchase of Bomber membership interests was

consummated in this District.

## FACTUAL ALLEGATIONS

13.     As of  July 31, 2012, Anapolle owned 95% of the membership interests in

defendant Bomber, LLC, a company that marketed it's own filed ski line and marketed co-branded

skis for other companies, and was its manager.

14.     On July 31, 2012, Anapolle filed a Chapter 7 bankruptcy petition in the U.S.

Bankruptcy Court for the District of Massachusetts, Case No.12-16381.

15.     A true and correct copy of Anapolle's Chapter 7 petition is attached hereto as

Exhibit 1.

16.     On September 13,  2012, the principals of Plaintiff first met Anapolle, in a New York City restaurant.  At that time, Anapolle misrepresented himself to one of the principals of Plaintiff, Brian Lederman, as the second cousin of one of Mr. Lederman's closest friends, who had just gotten married. Because this friend was on his honeymoon for several weeks, Mr Lederman was unable to verify this statement. However, after purchasing membership interests as described below, IQ Management learned when the alleged second cousin returned from his honeymoon and was asked about Anapolle's claim, that that representation was false.

17.     Bomber is a ski manufacturer.  Anapolle also represented that he had numerous contracts for the purchase of Bomber's private label and co-branded skis but needed immediate cash to allow Bomber to complete its website as well as fill those orders.  He further represented to IQ Management that he would lose the orders that he already had booked if he was not able to obtain an immediate infusion of cash into Bomber.

18.     In furtherance of Anapolle's scheme to obtain funds from IQ Management, he called the principals of IQ Management on a daily basis as much as five or six times each day and night including Sunday mornings at 8:00 am, explaining all of the orders that Bomber had and that time was of the essence and urgency in fulfilling Bomber's orders.

19.     In furtherance of Anapolle's scheme to obtain funds from IQ Management, he called the principals of IQ Management on a daily basis explaining all of the orders that Bomber had and that time was of the essence in fulfilling Bomber's orders.

20.     Although normally IQ Management would perform extensive due diligence prior to purchasing a minority interest in a closely held company, Anapolle induced IQ Management to send funds before doing due diligence, because of the immediate need for capital.  Because

Anapolle claimed to be related to a close friend of one of IQ Management's principals, because of the immediate need for an infusion of capital and because Anapolle specifically promised that (a) IQ Management could take an active roll in the operation and sales of Bomber, (b) Bomber would provide any requested documents regarding sales and orders, and (c) give IQ Management access to all corporate documents, bank account information and correspondence after IQ Management transferred the funds for the purchase of Bomber membership interests, IQ Management wire-transferred $150,000 to Bomber's account at TD Bank.

21.     On October 16, 2012 and after receiving IQ Management's funds, Anapolle further agreed to provide a liquidity and investment plan for the use of the proceeds of IQ Management's investment.

22.     Each of those representations was confirmed in writing by IQ Management on October 23, 2012.

23.     From September 12, 2012 through October 9, 2012, Anapolle represented to IQ Management various "facts" about the past revenues and current sales in order to induce IQ Management to invest needed capital into Anapolle's company, Bomber.

24.     In particular, Anapolle made the following representations to IQ Management specifically to induce IQ Management to purchase membership interests in Bomber:

(a)     At a lunch meeting on September 13, 2012, Anapolle grossly overstated his current sales to the principals of IQ Management, Stefan Kallibis and Brian Lederman. He stated he had approximately $300,000 in sales for the past year and this year 2012-2013, Bomber's sales would be approximately $600,000 based on existing orders, *i.e.*, double his 2012 sales;

(b)     On September 13, 2012, Anapolle also represented that he was the second cousin of one of Brian Lederman's closest friends, whose wedding, Kallibis and Lederman had just attended only days before.   Mr. Lederman's friend comes from a very

affluent and prominent family from Boston and based on Anapolle's claim to being Lederman's close friend's cousin made the venture even more interesting because if he was related to Mr. Lederman's friend, chances were he was legit and honest with his statements;

(c)    On September 13, 2012, Anapolle claimed that he had graduated from Harvard Medical School and was a practicing surgeon and even claimed that he had done a surgery the week before and usually does a few each week;

(d)    On September 14th through October 16th , 2012, Anapolle claimed and reconfirmed on the 16th of October at the Mark Hotel on 77th Street and Madison Ave New York City in a meeting  with Mr. Lederman he was directly involved with the City of New York Parks and Recreations Dept. given that the Department was building a small ski mountain in Queens this year and next year in Central Park. and that Bomber had exclusive contract to be the exclusive provider of skis to the City.

(e)    On September 13, 2012, Anapolle claimed that he was about to sign agreements with New Balance and Warrior, In a meeting with Mr. Lederman on October 26th he reconfirmed these agreements which were in fact false statements , which were never signed;

(f)    On September 13, 2012, Anapolle represented to IQ Management that Bomber had sold ski's to the New York Yankees, when in fact he had given 10 pairs of skis away to the Yankees at no cost;

(g)    Anapolle claimed he had existing orders with the New York Stock Exchange but in truth had given skis away at no charge;

(h)    On or about September 13, 2012, Anapolle claimed to IQ Management to have sold 200 pairs of skis to a ski shop in Austria, but had never produced any records showing the sale, invoice or collection of this sale when Bombers normal payment terms at on a 30 day basis, and therefore IQ Management is informed and believes thereon that there was no such sale;

(i)    On September 13th and 14, 2012 and numerous times following, Anapolle repeatedly claimed to be the supplier or ski's for both the U.S. and Canadian ski teams, which was also false.

25.    In addition to the foregoing misrepresentations, and perhaps even more significant than the foregoing misrepresentations, made several significant and material omissions.  Had the omitted facts been disclosed, IQ Management never would have agreed to invest any funds with

Anapolle or Bomber.

26.     Specifically, Anapolle failed to disclose:

(a)     Prior to IQ Management's investment in Bomber, Anapolle filed a personal Chapter 7 bankruptcy on July 31, 2012, *In re Ross Anapolle*, U.S. Bankruptcy Court for the District of Massachusetts Case No. 12-16381. To further conceal his financial condition, Anapolle failed to file the bankruptcy schedules and Statement of Financial Affairs until October 1, 2012, after IQ Management had already purchased the Bomber membership interests.  Had IQ Management been informed of the bankruptcy, it would never have invested any funds in Bomber;

(b)     Anapolle failed to disclose that virtually his only source of income was money received by Bomber, and that he was using money from Bomber to pay his personal expenses, thereby jeopardizing the safety of IQ Management's investment since Anapolle controlled the use of IQ Management's funds;

(c)     Anapolle failed to disclose that he owed in excess of $1 million to the federal Internal Revenue Service, that he had no personal assets since he and his wife had filed for bankruptcy and that many of the alleged "orders" that Bomber allegedly had were actually skis donated without charge by Bomber for marketing purposes.

27.     Moreover, although Annapolle contended in the Bomber Operating Agreement that he had personally lent Bomber $50,000 at 12% interest in order to give IQ Management the illusion that he had a personal investment in the company, Anapolle failed to list any such "loan" on his bankruptcy schedules, filed under penalty of perjury.  Thus, on that fact alone, Anapolle has either lied to IQ Management or committed bankruptcy fraud.

28.     In essence, Anapolle embarked on a calculated scheme to defraud IQ Management into investing substantial funds into Bomber that Anapolle fully intended to use to fund his and his wife's lavish lifestyle at the expense of IQ Management.

29.     The scheme to defraud continues to the present day.  Anapolle repeatedly promised to provide copies of sales orders, expenses, and account for the use of IQ Management funds, but refused to provide them.

30.     Anapolle also induced Mr. Lederman flew to New York from Florida numerous times each month from late September through December to oversee and work together with Anapolle as agreed during the initial meetings between Anapolle and IQ Management.  Although on each occasion, Mr. Lederman flew to New York only to meet with Anapolle on the accounting and operations of Bomber and assist Anapolle in any way possible,  Anapolle made excuses and failed to make the time necessary to meet with Mr. Lederman, to further hide from IQ Management the true facts regarding Bomber's operation and the use of IQ Management's funds.

31.     Moreover, although entitled as a matter of right to review the books and records of Bomber as a minority shareholder, Anapolle had agreed , however after months of requests almost on a daily basis by phone as well as email Anapolle failed to provide the most fundamental information regarding the operation of the company that he manages.

32.     In particular, on October 16th through December 4, 2012, IQ Management made numerous written requests for the various business records that had been promised repeatedly but never provided pursuant to Delaware Stats. § 18-305(a).

33.     By return letter, Bomber refused to provide any of the requested information and continues to refuse to provide any of the information promised to IQ Management.

34.     Anapolle agreed to provide an accounting of how IQ Management's funds have been used and then refused to do so, all in breach of his clear fiduciary duties, and IQ Management is informed and based thereon believes that Anapolle has improperly diverted Bomber funds to his own use.

35.     As of February 6, 2013, IQ Management learned that Anapolle had embezzled significant amounts of funds for his own personal use, such as lavish dinners, private school tuition

for his children, and even smaller items such as paying his personal cable bill and purchasing songs on iTunes with the company debit card.

36.     In the face of clear fraud, breach of fiduciary duty and the bankruptcy, IQ Management has been left with no other choice but to seek immediate relief in this Court.

## FIRST CAUSE OF ACTION

**(Securities Fraud Against Bomber, LLC pursuant to 15 U.S.C. § 78j(b) and SEC Rule 10b-5)**

37.     Plaintiff incorporates the allegations set forth above as though restated herein in full.

38.     The Bomber LLC membership interests are "securities" as that term is used in the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).

39.     The acts and omissions described above constitute manipulative or deceptive contrivances as referred to in § 78j(b) and violate the implementing regulations of the Securities and Exchange Commission at 17 C.F.R. § 240.10b-5.

40.     Specifically, and as set forth above, in connection with the sale of securities to IQ Management, Defendants Anapolle and Bomber  employed a scheme or artifice to defraud by:

(a)     fraudulently inducing IQ Management on September 13th and 14th, 2012 to quickly invest $300,000 based on promises of cooperation and the production of any corporate and business records requested, misrepresenting the financial condition of Bomber;

(b)     On September 13th - 15th, 2012, misrepresenting the nature and extent of Anapolle's investment in Bomber;

(c)     On September 13th -15th , 2012 misrepresenting Anapolle's financial background;

(d)     On September 13th -15th , 2012 providing false information about the status of actual orders received by Bomber;

     (e)     On October 6, promising to provide documentation of the sales, revenue and expenses of Bomber, while knowing that he had no intention of providing those records to Plaintiff, since those records would have exposed Anapolle's improper diversion of funds.

41.     These misrepresentations to IQ Management were material, in that they painted a grossly inaccurate statement of Bomber's current financial condition and Anapolle's alleged expertise in managing Bomber.  With numerous current and filled orders, coupled with experienced and trustworthy management, IQ Management's investment appeared to be significantly safer than in truth it was.

42.     However, in truth, Anapolle intentionally inflated the performance of Bomber in order to fraudulently induce IQ Management into purchasing approximately 5% of Bomber for $150,000 with a false sense of legitimacy and urgency.

43.     In connection with the sale of securities to IQ Management, Defendants Anapolle and Bomber made untrue statements of a material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, including:

     (a)     Failing to disclose prior to IQ Management investing $150,000 in membership interests that Anapolle had filed a personal Chapter 7 bankruptcy petition on July 31, 2012;

     (b)     Failing to disclose that Anapolle personally owed in excess of $1 million in back taxes to the federal Internal Revenue Service;

     (c)     Failing to disclose that Anapolle was using company funds to pay for his personal expenses;

     (d)     Failing to disclose that Anapolle, by virtue of his filing bankruptcy, was no longer a member of Bomber under the terms of the Delaware Limited Liability Company Act and the terms of the Bomber Operating Agreement.

44.     In connection with the sale of securities to IQ Management, Defendants Anapolle

and Bomber also engaged in several acts, practices, and course of business which that operated and

Anapolle knew would operate as a fraud or deceit upon IQ Management in violation of Rule 10(b)-

5(c).  Specifically, despite repeated promises to do so from October 9, 2012 through and including

December 15, 2012, and in addition to the foregoing acts, Anapolle and Bomber:

(a)     continued to lull and mislead IQ Management regarding the financial condition of
Bomber, the extent of Bomber's sales and expenses;

(b)     Continued to refuse to disclose the use of IQ Management's funds; and

(c)     Continued to refuse to provide even the simplest cash flow and balance sheet
analysis.

45.     The purpose of these acts were to lull IQ Management into not commencing any

litigation against Bomber or Anapolle until such time as Anapolle could use all of IQ

Management's funds to support his lifestyle.

46.     Moreover, Anapolle has recently contended that his membership interests in

Bomber belonged to the bankruptcy estate and he therefore had no right to sell them to IQ

Management.

47.     Anapolle and Bomber intentionally made these misrepresentations and intentionally

omitted these material facts in order to induce IQ Management to invest substantial funds into

Bomber which Anapolle could then use to fund his personal lifestyle.

48.     Anapolle and Bomber knew that the representations and omissions were false at the

time that they were made, and intended IQ Management to rely on the representations and failures

to disclose.

49.     IQ Management justifiably relied on the misrepresentations and material omissions

and invested $150,000 into Bomber.  However, had IQ Management known of Anapolle's and

Bomber's misrepresentations and omissions of material facts, IQ Management never would have

invested any money in Bomber securities.

50.     As a proximate result of the foregoing violations of Rule 10(b)-5, IQ Management

has suffered and continues to suffer damages in excess of $150,000 together with its reasonable

attorney's fees and costs.

## SECOND CAUSE OF ACTION

### (Controlling Person Liability Against Anapolle Pursuant to 15 U.S.C. § 78t(a)

51.     Plaintiff incorporates the allegations set forth above as though restated herein in

full.

52.     At all times relevant hereto, Anapolle directly controlled Bomber, LLC in

committing the foregoing violations of Rule 10(b)-5 and in bad faith, directly caused Bomber,

LLC's violation of Rule 10(b)-5.

53.     Accordingly, Anapolle is liable jointly and severally with and to the same extent as

Bomber, LLC to IQ Management.

## THIRD CAUSE OF ACTION

### (Rescission)

54.     Plaintiff incorporates the allegations set forth above as though restated herein in

full.

55.     On or about September 25, 2012, and in reliance on the foregoing representations

and omissions, IQ Management executed a "Subscription Agreement" contract with Bomber, LLC

for the purchase of five percent of the membership interests in Bomber, LLC for the payment of $150,000 and the promise of a future payment of an additional $150,000.

56.     A true and correct copy of the Subscription Agreement confirming IQ Management's purchase of shares in Bomber, LLC for $150,000 is attached hereto as <u>Exhibit 2</u>.

57.     IQ Management fully performed all acts required of it by virtue of its written contract with Bomber, LLC, including the payment of $150,000 to Bomber in Massachusetts.

58.     However, had IQ Management known of the falsity of the material representations made to it or knew of the material omissions of fact not disclosed by Anapolle and Bomber, LLC, IQ Management never would have invested any money in Bomber.

59.     IQ Management hereby offers to return all membership interests and any other consideration to Bomber, LLC that IQ Management received from Bomber.

60.     As a proximate result of Bomber's and Anapolle's fraudulently inducing IQ Management to purchase membership interests in Bomber, IQ Management seeks a declaration that the Subscription Agreement is rescinded and Bomber must return $150,000 paid to date for Bomber membership interests to IQ Management.

## <u>FOURTH CAUSE OF ACTION</u>

### (Breach of Fiduciary Duty)

61.     Plaintiff incorporates the allegations set forth above as though restated herein in full.

62.     From September 25, 2012 through at least February 5, 2012, Anapolle was the manager of Bomber.

63.     IQ Management is the ostensible holder of 5.2632% of the membership interests in

Bomber.

64.     Accordingly, under common law and the Delaware Limited Liability Company Act,

Anapolle owed a fiduciary duty to IQ Management of utmost good faith, loyalty and fair dealing.

65.     To the extent that this cause of action can be classified as a derivative rather than

direct claim by IQ Management, demand on Bomber to bring this claim is futile.  First, Anapolle is

is neither disinterested nor independent, since Anapolle, the wrongdoer is the manager of Bomber.

Second, the challenged transaction is not the product of a valid exercise of business judgment,

since committing securities fraud and refusing to produce information to which members are

statutorily entitled is never an exercise of business judgment.  Accordingly, any requirement that

demand had to be made on Bomber is futile.

66.     By the conduct alleged above, including without limitation, Anapolle's fraudulent

misrepresentations, material omissions, refusal to account for funds used and his refusal to provide

documents both pursuant to his agreement with IQ Management and the duties imposed on him by

Delaware Stats. § 18-305, Anapolle has breached his fiduciary duties owed to IQ Management.

67.     As a direct and proximate result of Anapolle's breach of fiduciary duty, IQ

Management has suffered and continues to suffer damages in an amount to be determined at trial

but in no instance less than $150,000.

## FIFTH CAUSE OF ACTION

### (Common Law Fraud against Anapolle and Bomber)

68.     Plaintiff incorporates the allegations set forth above as though restated herein in

full.

69.     IQ Management incorporates the specifically identified misrepresentations and

fraudulent omissions set forth in ¶¶ 14-37, each of which is actionable as common law fraud. However, even after IQ Management's "purchase" of the membership interests in Bomber, Anapolle continued to make fraudulent misrepresentations to IQ Management and schemed to hide his prior misrepresentations from IQ Management.

70.     For example, after Mr. Lederman's close friend returned from his honeymoon in early October, he discovered that Anapolle was not his close friend's cousin and learned from his friend that Anapolle had on several occasions made the same representation to others in order to appear to be "legitimate."

71.     As a result of this conversation, IQ Management demanded that Anapolle provide his Driver's License and US Passport so that IQ Management could actually verify Anapolle's true identity . Moreover, Anapolle agreed to send IQ Management a detailed list of sales and expenses, including copy of the Bomber bank statement showing use of the proceeds of IQ Management's investment. Anapolle failed to ever send the bank statement and any supporting documents showing use of proceeds.

72.     However, Anapolle refused and finally called IQ Management with his attorney, agreeing to send the various accounting documents and a copy of Anapolle's identification immediately after IQ Management signed a non-disclosure agreement.

73.     However, despite executing the non-disclosure agreement, no accounting statements, bank statements or detailed and accurate use of proceeds were ever provided.  Instead, he presented a list of expenses a month later, which even Anapolle admitted in writing was inaccurate.

74.     Anapolle also represented on October 16, 2012 to Brian Lederman at the Mark

Hotel in New York City that a Bomber web site, which was created with funds from IQ Management's investment, was ready to launch. However, there was no website completed and launched at that time.

75.     Anapolle also represented during this meeting that NBC Sports was a new client and they were placing large orders.   However, despite repeatedly promising to provide information on these alleged orders, Anapolle continued to agree to produce the information, knowing that he had no intention of actually producing them.

76.     In short, although Anapolle continued to make rosy claims to IQ Management that orders for the Bomber skis were coming in "like crazy and the company was taking off," he continued to make excuses for failing to provide even the most basic accounting statements to hide his scheme to defraud IQ Management and embezzle the company funds for is own use.

77.     At the time that Anapolle made the foregoing misrepresentations and omissions, Anapolle knew that the misrepresentations were false and intended that IQ Management rely on the statements and the omissions.

78.     IQ Management reasonably relied on the foregoing misrepresentations and material omissions by among other things, investing $150,000 into Bomber, not acting to implement tight controls over the funds invested, and not taking steps to remove Anapolle as manager of Bomber.

79.     Moreover, although Anapolle purported to transfer membership interests in Bomber to IQ Management on September 25, 2012 as shown in the Subscription Agreement, Anapolle had previously filed bankruptcy and therefore, all of his membership interests in Bomber became property of the bankruptcy estate, and he had no "membership interests" to sell.

80.     Anapolle knew that he no longer had any ownership interest in any of his

membership interests as that exact fact is set forth in Bomber's Amended and Restated LLC Agreement.

81.     A true and correct copy of Bomber's Amended and Restated LLC Agreement signed by Anapolle and IQ Management is attached hereto as <u>Exhibit 3.</u>

82.     Anapolle intentionally omitted the material fact that he no longer had any ownership in the membership interests that he was purporting to "sell" to IQ Management for $150,000 on or about September 25, 2012 – six weeks after filing bankruptcy.

83.     Anapolle failed to disclose the bankruptcy, intending to induce IQ Management into sending its funds to Bomber prior to discovering the bankruptcy.  Moreover, he used a different spelling of his name to further delay IQ Management.

84.     Not knowing of the bankruptcy and Anapolle's apparent lack of title to convey *any* shares of Bomber to IQ Management, IQ Management justifiably relied on Anapolle's failure to disclose, among other things, the existence of the bankruptcy , and wire-transferred the $150,000 to Bomber.

85.     After receiving the funds, Anapolle embezzled the funds to his own personal uses, while refusing to give IQ Management any financial information that would disclose his embezzlement.

86.     As a proximate result of Anapolle's and Bomber's fraud, IQ Management has suffered and continues to suffer damages in an amount to be determined at trial but in excess of $150,000.

## SIXTH CAUSE OF ACTION

### (Declaratory Relief against Bomber)

87.     Plaintiff incorporates the allegations set forth above as though restated herein in

full.

88.     Because Bomber continued to refuse to provide the documents that Anapolle had

repeatedly promised to provide, IQ Management, in its capacity as a minority shareholder of

Bomber, made a written request to produce all books and records of the company for inspection

pursuant to Delaware Stats. § 18-305(a).  As provided in that statute, on December 4, 2012, IQ

Management requested in writing to Bomber's counsel that Bomber provide at least the following:

(1)     True and full information regarding the status of the business and financial
        condition of the limited liability company;

(2)     Promptly after becoming available, a copy of the limited liability company's federal,
        state and local income tax returns for each year;

(3)     A current list of the name and last known business, residence or mailing address of
        each member and manager;

(4)     A copy of any written limited liability company agreement and certificate of
        formation and all amendments thereto, together with executed copies of any written
        powers of attorney pursuant to which the limited liability company agreement and
        any certificate and all amendments thereto have been executed;

(5)     True and full information regarding the amount of cash and a description and
        statement of the agreed value of any other property or services contributed by each
        member and which each member has agreed to contribute in the future, and the date
        on which each became a member; and

(6)     Other information regarding the affairs of the limited liability company as is just
        and reasonable.

89.     In response to that written request, Bomber refused to produce any of the requested

documents.

90.     In addition, because Anapolle has filed a voluntary bankruptcy petition, by virtue of

the Bomber Operating Agreement, Article VII(i) as well as Delaware Stats. § 18-304(1)(b),

Anapolle has ceased to be a member of Bomber and no longer has any voting rights.

91.     Accordingly, on February 5, 2013, IQ Management exercised its voting rights to

remove Anapolle as manager.

92.     There is a dispute between Bomber and IQ Management concerning whether IQ

Management is entitled to the documents enumerated in §18-305(a) and whether the removal of

Anapolle as Manager by IQ Management complied with applicable Delaware law.

93.     Accordingly, IQ Management seeks a declaration of rights from this Court that (1)

Anapolle no longer is a member of Bomber, LLC; (2) Anapolle has been validly removed as

Manager by a vote of the majority of voting members and (3) that IQ Management is entitled to

full production of each of the categories of documents listed in § 18-305(a) and in its written

demand.

## SEVENTH CAUSE OF ACTION

### (Constructive Trust)

94.     Plaintiff incorporates the allegations set forth above as though restated herein in

full.

95.     After his removal as manager by IQ Management on February 5, 2013, Anapolle

has recently contended he had sold a portion of his membership interests to IQ Management for

$150,000 that had actually belonged to the bankruptcy estate, and therefore he had no valid title to

the membership interests sold to IQ Management.

96.     The bankruptcy trustee has recently stated that he intends to abandon the Estate's

interests in Bomber, LLC.

97.     Accordingly, the membership interests in Bomber would revert to Anapolle.

98.     As a result of the foregoing conduct, IQ Management asks that this Court impose a constructive trust on all membership interests that are received by Anapolle, and that Anapolle be enjoined from transferring any of his membership interests in Bomber pending the resolution of this action.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all claims so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff IQ Management, LLC respectfully prays for the following relief:

1.     General damages in an amount to be determined at trial but no less than $150,000;

2.     Rescission of its contract to purchase 5.2632% of the membership interests in Bomber for $150,000 upon the return of IQ Management's $150,000 together with general and special damages incurred pursuant thereto;

3.     A constructive trust on all membership interests in Bomber that are obtained by Anapolle as a result of any abandonment action by the Chapter 7 trustee;

4.     An injunction against Anapolle's further transfer of any membership interests in Bomber, LLC;

5.     Prejudgment interest from the date of IQ Management's investment;

6.     IQ Management's costs and reasonable attorney's fees;

7.     A declaration of rights from this Court that (1) Anapolle no longer is Manager of Bomber, LLC and (2) that IQ Management is entitled to full production of each of

-21-

the categories of documents listed in § 18-305(a) and in its written demand;

8.     Such other and further relief as this Court deems just and appropriate.

Respectfully Submitted,

IQ MANAGEMENT, LLC,
By its attorneys,

Dated:  March 8, 2013                    By:_____
                                         Philip H. Stillman, Esq. (BBO# 555555)
                                         Pstillman@stillmanassociates.com
                                         STILLMAN & ASSOCIATES
                                         300 South Pointe Drive, Suite 4206
                                         Miami Beach, Florida 33139
                                         (888) 235-4279

**Exhibit 1**

B1 (Official Form 1)(12/11)

| **United States Bankruptcy Court**<br>**District of Massachusetts** | **Voluntary Petition** |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>**Anapolle, Ross L.** | Name of Joint Debtor (Spouse) (Last, First, Middle):<br>**Anapolle, Shoshana A.** |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete EIN<br>(if more than one, state all)<br>**xxx-xx-4869** | Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete EIN<br>(if more than one, state all)<br>**xxx-xx-5058** |
| Street Address of Debtor (No. and Street, City, and State):<br>**70 Pickwick Road**<br>**West Newton, MA**<br><div style="text-align:right">ZIP Code<br>**02465-2819**</div> | Street Address of Joint Debtor (No. and Street, City, and State):<br>**70 Pickwick Road**<br>**West Newton, MA**<br><div style="text-align:right">ZIP Code<br>**02465-2819**</div> |
| County of Residence or of the Principal Place of Business:<br>**Middlesex** | County of Residence or of the Principal Place of Business:<br>**Middlesex** |
| Mailing Address of Debtor (if different from street address):<br><div style="text-align:right">ZIP Code</div> | Mailing Address of Joint Debtor (if different from street address):<br><div style="text-align:right">ZIP Code</div> |
| Location of Principal Assets of Business Debtor<br>(if different from street address above): | |

---

**Type of Debtor**
(Form of Organization) (Check one box)

■ Individual (includes Joint Debtors)
*See Exhibit D on page 2 of this form.*
☐ Corporation (includes LLC and LLP)
☐ Partnership
☐ Other (If debtor is not one of the above entities, check this box and state type of entity below.)

**Nature of Business**
(Check one box)

☐ Health Care Business
☐ Single Asset Real Estate as defined in 11 U.S.C. § 101 (51B)
☐ Railroad
☐ Stockbroker
☐ Commodity Broker
☐ Clearing Bank
☐ Other

**Chapter of Bankruptcy Code Under Which the Petition is Filed** (Check one box)

■ Chapter 7
☐ Chapter 9          ☐ Chapter 15 Petition for Recognition
☐ Chapter 11            of a Foreign Main Proceeding
☐ Chapter 12         ☐ Chapter 15 Petition for Recognition
☐ Chapter 13            of a Foreign Nonmain Proceeding

**Chapter 15 Debtors**

Country of debtor's center of main interests:

Each country in which a foreign proceeding by, regarding, or against debtor is pending:

**Tax-Exempt Entity**
(Check box, if applicable)

☐ Debtor is a tax-exempt organization under Title 26 of the United States Code (the Internal Revenue Code).

**Nature of Debts**
(Check one box)

■ Debts are primarily consumer debts, defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."          ☐ Debts are primarily business debts.

---

**Filing Fee** (Check one box)

■ Full Filing Fee attached

☐ Filing Fee to be paid in installments (applicable to individuals only). Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.

☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must attach signed application for the court's consideration. See Official Form 3B.

**Chapter 11 Debtors**
Check one box:
☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).
☐ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).
Check if:
☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,343,300 *(amount subject to adjustment on 4/01/13 and every three years thereafter).*
Check all applicable boxes:
☐ A plan is being filed with this petition.
☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

---

**Statistical/Administrative Information**

☐ Debtor estimates that funds will be available for distribution to unsecured creditors.
■ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

<div style="text-align:right">THIS SPACE IS FOR COURT USE ONLY</div>

Estimated Number of Creditors

| ■ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| 1-49 | 50-99 | 100-199 | 200-999 | 1,000-5,000 | 5,001-10,000 | 10,001-25,000 | 25,001-50,000 | 50,001-100,000 | OVER 100,000 |

Estimated Assets

| ☐ | ☐ | ☐ | ☐ | ■ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | $100,000,001 to $500 million | $500,000,001 to $1 billion | More than $1 billion |

Estimated Liabilities

| ☐ | ☐ | ☐ | ☐ | ■ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | $100,000,001 to $500 million | $500,000,001 to $1 billion | More than $1 billion |

B1 (Official Form 1)(12/11)                                                                                                          Page 2

| **Voluntary Petition**<br><br>*(This page must be completed and filed in every case)* | Name of Debtor(s):<br>**Anapolle, Ross L.**<br>**Anapolle, Shoshana A.** |
|---|---|

| **All Prior Bankruptcy Cases Filed Within Last 8 Years** (If more than two, attach additional sheet) | | |
|---|---|---|
| Location<br>Where Filed:   **- None -** | Case Number: | Date Filed: |
| Location<br>Where Filed: | Case Number: | Date Filed: |

| **Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor** (If more than one, attach additional sheet) | | |
|---|---|---|
| Name of Debtor:<br>**- None -** | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

| **Exhibit A**<br><br>(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>☐ Exhibit A is attached and made a part of this petition. | **Exhibit B**<br>(To be completed if debtor is an individual whose debts are primarily consumer debts.)<br><br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I delivered to the debtor the notice required by 11 U.S.C. §342(b).<br><br>X  **/s/ Richard N. Gottlieb Mass. BBO #     July 31, 2012**<br>  Signature of Attorney for Debtor(s)            (Date)<br>  **Richard N. Gottlieb Mass. BBO # 547970** |
|---|---|

| **Exhibit C** |
|---|
| Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?<br><br>  ☐ Yes, and Exhibit C is attached and made a part of this petition.<br>  ■ No. |

| **Exhibit D** |
|---|
| (To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)<br><br>  ■ Exhibit D completed and signed by the debtor is attached and made a part of this petition.<br><br>If this is a joint petition:<br>  ■ Exhibit D also completed and signed by the joint debtor is attached and made a part of this petition. |

| **Information Regarding the Debtor - Venue**<br>(Check any applicable box) |
|---|
| ■  Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.<br><br>☐  There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.<br><br>☐  Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District. |

| **Certification by a Debtor Who Resides as a Tenant of Residential Property**<br>(Check all applicable boxes) |
|---|
| ☐  Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)<br><br>  _____<br>  (Name of landlord that obtained judgment)<br><br><br>  _____<br>  (Address of landlord)<br><br>☐  Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and<br><br>☐  Debtor has included in this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.<br><br>☐  Debtor certifies that he/she has served the Landlord with this certification. (11 U.S.C. § 362(l)). |

B1 (Official Form 1)(12/11)                                                                                                           Page 3

| Voluntary Petition | Name of Debtor(s): |
|---|---|
| *(This page must be completed and filed in every case)* | **Anapolle, Ross L.**<br>**Anapolle, Shoshana A.** |

## Signatures

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.
[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7. [If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. §342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X **/s/ Ross L. Anapolle**
Signature of Debtor **Ross L. Anapolle**

X **/s/ Shoshana A. Anapolle**
Signature of Joint Debtor **Shoshana A. Anapolle**

Telephone Number (If not represented by attorney)

**July 31, 2012**
Date

### Signature of Attorney*

X **/s/ Richard N. Gottlieb Mass. BBO #**
Signature of Attorney for Debtor(s)

**Richard N. Gottlieb Mass. BBO # 547970**
Printed Name of Attorney for Debtor(s)

**Law Offices of Richard N. Gottlieb**
Firm Name

**Eleven Beacon Street**
**Suite 325**
**Boston, MA 02108**

Address

**Email: rnglaw@verizon.net**
**(617) 742-4491  Fax: (617) 742-5188**
Telephone Number

**July 31, 2012**
Date
*In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect.

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Authorized Individual

_____
Printed Name of Authorized Individual

_____
Title of Authorized Individual

_____
Date

### Signature of a Foreign Representative

I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.

(Check only one box.)

☐ I request relief in accordance with chapter 15 of title 11. United States Code. Certified copies of the documents required by 11 U.S.C. §1515 are attached.

☐ Pursuant to 11 U.S.C. §1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.

X _____
Signature of Foreign Representative

_____
Printed Name of Foreign Representative

_____
Date

### Signature of Non-Attorney Bankruptcy Petition Preparer

I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19 is attached.

_____
Printed Name and title, if any, of Bankruptcy Petition Preparer

_____
Social-Security number (If the bankrtpcy petition preparer is not an individual, state the Social Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.)(Required by 11 U.S.C. § 110.)

_____
Address

X _____
_____
Date

Signature of bankruptcy petition preparer or officer, principal, responsible person,or partner whose Social Security number is provided above.

Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. §110; 18 U.S.C. §156.*

# United States Bankruptcy Court
### District of Massachusetts

In re    **Ross L. Anapolle**
       **Shoshana A. Anapolle**                  Case No. _____

                                 Debtor(s)            Chapter     **7**

## DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR(S)

1.  Pursuant to 11 U.S.C. § 329(a) and Bankruptcy Rule 2016(b), I certify that I am the attorney for the above-named debtor and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

| | | |
|---|---|---|
| For legal services, I have agreed to accept | $ | **4,906.00** |
| Prior to the filing of this statement I have received | $ | **4,906.00** |
| Balance Due | $ | **0.00** |

2.  $ **0.00** of the filing fee has been paid.

3.  The source of the compensation paid to me was:

    ■ Debtor      ☐ Other (specify):

4.  The source of compensation to be paid to me is:

    ■ Debtor      ☐ Other (specify):

5.  ■ I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm.

    ☐ I have agreed to share the above-disclosed compensation with a person or persons who are not members or associates of my law firm. A copy of the agreement, together with a list of the names of the people sharing in the compensation is attached.

6.  In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

    a.  Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
    b.  Preparation and filing of any petition, schedules, statement of affairs and plan which may be required;
    c.  Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;
    d.  [Other provisions as needed]
    **Negotiations with secured creditors to reduce to market value to the extent applicable; exemption planning; preparation and filing of motions pursuant to 11 USC 522(f)(2)(A) for avoidance of liens to the extent applicable.**

7.  By agreement with the debtor(s), the above-disclosed fee does not include the following service:
    **Representation of the debtors in any dischargeability actions, relief from stay actions or any other adversary proceeding.**

---

### CERTIFICATION

     I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding.

Dated:    **July 31, 2012**                        **/s/ Richard N. Gottlieb Mass. BBO #**
                                                 **Richard N. Gottlieb Mass. BBO # 547970**
                                                 **Law Offices of Richard N. Gottlieb**
                                                 **Eleven Beacon Street**
                                                 **Suite 325**
                                                 **Boston, MA 02108**
                                                 **(617) 742-4491  Fax: (617) 742-5188**
                                                 **rnglaw@verizon.net**

American Express
American Express Special Research
Po Box 981540
El Paso, TX 79998

American Profit Recove
33 Boston Post Road W #140
Marlborough, MA 01752

Amex
American Express Special Research
Po Box 981540
El Paso, TX 79998

Bank Of America
Po Box 982238
El Paso, TX 79998

Benco Dental
257 Cedar Hill
Suite 100
Marlborough, MA 01752

Bodoff & Associates
120 Water Street
Fourth Floor
Boston, MA 02109-4210

C. A. Brandt, Accountant
18 Commerce Way, Suite 1650
Woburn, MA 01801

Calvary Portfolio Services
Attention: Bankruptcy Department
500 Summit Lake Dr. Suite 400
Valhalla, NY 10595

Cap-Dent Dental Laboratory
64 Bright Street
Waltham, MA 02453

Capital Properties
31 Saint James Avenue
Suite 270
Boston, MA 02116

Chase
Chase Card Services
Po Box 15298
Wilmington, DE 19850

Chase Manhattan
Attn: Bankruptcy Research Dept
3415 Vision Dr., Mail Code Oh4-7302
Columbus, OH 43219

Chase Manhattan
Attn:  Bankruptcy Research Dept
3415 Vision Dr., Mail Code Oh4-7302
Columbus, OH 43219

Chela/Sallie Mae
Attn: Claims Department
Po Box 9500
Wilkes-Barre, PA 18773

Citibank Sd, Na
Attn: Centralized Bankruptcy
Po Box 20507
Kansas City, MO 64195

D'Agostine, Levine, Parra & Netburn, P.C
Attorney Cathy S. Netburn
268 Main Street
Acton, MA 01720

Darby Dental Supply, LLC
300 Jericho Quadrangle
Jericho, NY 11753

Dsnb Bloom
Macy's Bankruptcy Dept.
9111 Duke Blvd.
Mason, OH 45040

First Data
1307 Walt Whitman Rd
Melville, NY 11747

Grey Lady Marine Marina
Nantucket, MA 02554

Guraino South Shore Gunite Pools
7 Progress Avenue
Chelmsford, MA 01824

Harvard Univ/student L
580 Holyoke Ctr
Cambridge, MA 02138

Lambert & Associates
92 State Street
Boston, MA 02109

Land Rover
Po Box 6275
Dearborn, MI 48121

Land Rover
Po Box 6275
Dearborn, MI 48121

Land Rover
Po Box 6275
Dearborn, MI 48121

Land Rover
Po Box 6275
Dearborn, MI 48121

Land Rover
Po Box 6275
Dearborn, MI 48121

M&t Credit Services Ll
1100 Worley Drive
Consumer Asset Management 2nd Floor/Attn
Williamsville, NY 14221

Patterson Dental
400 Research Drive
Suite 110
Wilmington, MA 01887

Payne Bouchier builders
173 Norfolk Avenue
Boston, MA 02119

Porsche Financial Srvc
4343 Commerce Ct Ste 214
Lisle, IL 60532

Porsche Financial Srvc
4343 Commerce Ct Ste 214
Lisle, IL 60532

Porsche Financial Srvc
4343 Commerce Ct Ste 214
Lisle, IL 60532

Real Time Resolutions

Sam's Reliable Dental Lab, Inc.
3 Dundee Park Drive
Suite B03
Andover, MA 01810

Student Loan Mkt Assn/Sallie Mae
Attention: Bankruptcy Litigation Unit
E3149, Po Box 9430
Wilkes-Barre, PA 18773

Student Loan Mkt Assn/Sallie Mae
Attention: Bankruptcy Litigation Unit
E3149, Po Box 9430
Wilkes-Barre, PA 18773

Sweetwater Pool Service & Supply
175 High Street
Waltham, MA 02453

Swomley Tennen, LLP
227 Lewis Wharf
Boston, MA 02110

The Village Bank
319 Auburn St
Auburndale, MA 02466

**Exhibit 2**

## SUBSCRIPTION AGREEMENT

This Subscription Agreement (the "***Agreement***") is effective as of September __, 2012 by and between Bomber LLC, a Delaware limited liability company (the "***Company***"), and IQ Management LLC, a Florida limited liability company ("***Investor***").

## PRELIMINARY STATEMENTS

The Company wishes to sell to Investor, and Investor wishes to purchase from the Company, on the date hereof, 150,000 Units of the Company (the "***Purchased Units***") at a purchase price of $1.00 per Unit on and subject to the terms set forth in this Agreement and in that certain Amended and Restated Limited Liability Company Agreement of the Company dated as of the date hereof among the Company, Investor and the other parties thereto (the "***LLC Agreement***").   In addition, the Investor hereby commits to purchase an additional 150,000 Units (the "***Additional Units***") at a purchase price of $1.00 per Unit at the request of the Company in accordance with Article 2 below.  All capitalized terms used and not otherwise defined herein shall have the respective meanings set forth in the LLC Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises, representations, warranties and conditions set forth in the LLC Agreement and in this Agreement, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1

## PURCHASE OF UNITS

1.1    <u>Purchase and Sale of Purchased Units</u>.  Subject to the terms and conditions of this Agreement and the LLC Agreement, Investor hereby purchases from the Company, and the Company hereby sells and issues to Investor, the Purchased Units.  As a condition to the purchase and sale of the Purchased Units, Investor shall execute a counterpart copy of the LLC Agreement.

1.2    <u>Consideration for Purchased Units</u>.  As consideration for the Purchased Units, on the date hereof Investor shall pay and deliver to the Company $150,000.00 in immediately available funds.

## ARTICLE 2

## COMMITMENT TO PURCHASE ADDITIONAL UNITS

2.1    <u>Additional Units</u>.  Investor hereby agrees and commits to purchase from the Company the Additional Units (*i.e.,* an additional 150,000 Units at a purchase price of $1.00 per Unit) at any time (and from time to time) upon the written request of the Company (each a "***Capital Call***" and any notice from the Company with respect thereto, a "***Capital Call Notice***"). The Company may issue and deliver a Capital Call Notice to the Investor at any time.  Each such

Capital Call Notice shall specify the number of Units to be issued by the Company and the expected closing date with respect thereto.   Upon receipt of a Capital Call Notice, the Investor shall pay the purchase price for the Units to be so issued directly to the Company.  The closing of the purchase and sale of the Additional Units shall take place not later than two (2) business days after the delivery of the Capital Call Notice from the Company to the Investor.

2.2     Certain Agreements with Respect to the Additional Units.  Upon the purchase of the entire 150,000 Additional Units by the Investor (and the related payment of the purchase price therefor), the Company will use its commercially reasonable efforts to increase the size of its board of managers to three and to add one representative of the Investor to its board of managers.

ARTICLE 3

RIGHT OF FIRST REFUSAL ON FUTURE FINANCINGS

If, at any time prior to June 30, 2013, the Company seeks to raise additional equity financing capital (other than the issuance of equity incentives to its employees) from new investors, then, prior to authorizing the issuance of any additional Units to new investors, the Company shall first provide the Investor with a right of first refusal with respect to such issuance.   In such event, the Company shall provide the Investor with written notice of the proposed terms of such issuance (the "*Notice of Issuance*").   The Investor shall have five (5) business days to submit a binding, written offer to purchase all of the Units proposed to be issued by the Company on the same terms as are set forth in the Notice of Issuance.  If the Investor does not so submit a binding written offer within such 5-business day period (or if the Investor declines the offer), then the Investor's right of first refusal under this Article 3 shall automatically terminate and expire without further action of the parties, and the Company shall be free to issue such Units to the new investor(s).  If the Investor does, however, submit a binding offer, then the Company and the Investor shall take such actions as are necessary to close the purchase and sale of the Units on the terms set forth in the Notice of Issuance within 10 business days after the initial delivery of the Notice of Issuance.  If the transaction does not close within such 10-busines day period (other than for failure of the Company to materially comply with its obligations hereunder) then the Investor's right of first refusal under this Article 3 shall automatically terminate and expire without further action of the parties, and the Company shall be free to issue such Units to the new investor(s).

ARTICLE 4

REPRESENTATIONS, WARRANTIES AND AGREEMENTS OF INVESTOR

Investor represents, warrants and covenants to the Company that:

4.1     Organization and Qualification.  Investor is a limited liability company, duly organized, validly existing, and in good standing under the laws of the state of Florida.  Investor has all requisite power and authority to carry on its business as presently conducted and as proposed to be conducted and to own and use the properties owned and used by it.

4.2     Authority.   Investor has the full legal right, power, authority, and approval required to enter into, execute, and deliver this Agreement and the LLC Agreement and to incur and perform fully its obligations hereunder and thereunder.   This Agreement and the LLC Agreement have been duly executed and delivered and constitute the valid and legally binding obligations of Investor enforceable in accordance with their respective terms.   Investor is not a party to any agreement or subject to any other legal restrictions that would prevent or restrict complete fulfillment of any of the terms and conditions of this Agreement or the LLC Agreement or compliance with Investor's obligations hereunder or thereunder.   Investor is not, to its knowledge, required to make any filing with, or obtain any consent of any Person in order to consummate the transactions contemplated by this Agreement or the LLC Agreement.

4.3     Non-Contravention.   The execution, delivery and performance by Investor of this Agreement and the LLC Agreement, and the consummation by Investor of the transactions contemplated hereby and thereby, have been duly authorized by all necessary action and do not and will not, with or without the giving of notice or the passage of time or both, (a) violate any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to Investor, (b) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, cause the creation of any lien, charge or encumbrance upon the properties or assets of Investor pursuant to any agreement to which Investor is a party or by which Investor is bound or to which any of Investor's assets is subject or (c) violate any of the organizational or governing documents of Investor.

4.4     Investment Representations.

(a)     The Purchased Units will be acquired by Investor for investment only, for its own account and not as a nominee or agent and not with a view to the sale or distribution of any part thereof in violation of applicable federal and state securities laws, and Investor has no current intention of selling, granting participation in or otherwise distributing the Purchased Units in violation of applicable federal and state securities laws. By executing this Agreement, Investor further represents that Investor does not have any agreement with any Person to sell, transfer or grant participation to any third Person, with respect to any of the Purchased Units in violation of applicable federal and state securities laws.

(b)     Investor understands that the Purchased Units have not been registered under the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (the "***1933 Act***") on the basis that the sale provided for in this Agreement is exempt from registration under the 1933 Act and that the Company's reliance on such exemption is predicated on the representations and warranties of Investor set forth herein.

(c)     Investor represents that it is an accredited investor (as such term is defined in Rule 501 of the 1933 Act).   Investor represents that it is a sophisticated investor and has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment in the Company.   Investor further represents that it (i) is familiar with the business and financial condition, properties, operations and prospects of the Company and its Subsidiaries and (ii) has had, during the course of the transactions contemplated hereby and prior to its purchase of the Purchased Units, the opportunity to ask

questions of, and receive answers from, the Company concerning the terms and conditions of the offering and to obtain additional information necessary to verify the accuracy of any information furnished to Investor or to which Investor has had access.  Investor has made, either alone or together with its advisors, such independent investigation of the Company as Investor deems to be, or its advisors deem to be, necessary or advisable in connection with this investment.

(d)     Investor represents that it will not Transfer the Purchased Units without registration under the 1933 Act and applicable state securities laws, or an exemption therefrom. Investor acknowledges that the Company has no obligation to repurchase or otherwise acquire or redeem any of the Purchased Units.

(e)     Investor represents that neither Investor nor anyone acting on its behalf has paid any commission or other remuneration to any Person in connection with the purchase of the Purchased Units.

(f)     Any certificate for the Purchased Units to be received by Investor will be imprinted with a legend in substantially the following form:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") OR THE SECURITIES LAWS OF ANY STATE, AND MAY NOT BE SOLD OR TRANSFERRED, SOLD, PLEDGED OR ASSIGNED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT UNLESS IN THE OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER AN EXEMPTION FROM REGISTRATION REQUIREMENTS OF THE ACT AND SUCH SECURITIES LAWS IS AVAILABLE. THE SECURITIES REPRESENTED HEREBY ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER AND CERTAIN OTHER AGREEMENTS SET FORTH IN A LIMITED LIABILITY COMPANY AGREEMENT BETWEEN THE ISSUER AND THE OTHER SIGNATORIES THERETO. THE ISSUER RESERVES THE RIGHT TO REFUSE THE TRANSFER OF THIS SECURITY UNTIL THE CONDITIONS THEREIN HAVE BEEN FULFILLED WITH RESPECT TO SUCH TRANSFER. A COPY OF SUCH AGREEMENT MAY BE OBTAINED BY THE HOLDER HEREOF AT THE ISSUER'S PRINCIPAL PLACE OF BUSINESS WITHOUT CHARGE.

ARTICLE 5

REPRESENTATIONS, WARRANTIES AND AGREEMENTS OF THE COMPANY

The Company represents, warrants and covenants to Investor that:

5.1     Authority. The Company has the full legal right, power, authority, and approval required to enter into, execute, and deliver this Agreement and to incur and perform fully its obligations hereunder. This Agreement and the LLC Agreement have been duly executed and delivered and constitute the valid and legally binding obligations of the Company enforceable in

accordance with their respective terms. The Company is not a party to any agreement or subject to any other legal restrictions that would prevent or restrict complete fulfillment of any of the terms and conditions of this Agreement or the LLC Agreement or compliance with the Company's obligations hereunder or thereunder. The Company is not required to make any filing with, or obtain any consent of any Person in order to consummate the transactions contemplated by this Agreement or the LLC Agreement, except for such filings as may be required by state and federal securities laws.

5.2     <u>Non-Contravention</u>. The execution, delivery and performance by the Company of this Agreement and the LLC Agreement, and the consummation by the Company of the transactions contemplated hereby and thereby, have been duly authorized by all necessary action and do not and will not, with or without the giving of notice or the passage of time or both, (a) violate any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to the Company, (b) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, cause the creation of any lien, charge or encumbrance upon the properties or assets of the Company pursuant to any agreement to which the Company is a party or by which the Company is bound or to which any of the Company's assets are subject or (c) violate the LLC Agreement or any of the other organizational or governing documents of the Company.

<div align="center">ARTICLE 6</div>

<div align="center">MISCELLANEOUS</div>

6.1     <u>Entire Agreement; Amendment</u>. This Agreement, together with the LLC Agreement, set forth the entire understanding of the parties hereto and supersede all prior agreements, arrangements and communications, whether oral or written, with respect to the subject matter hereof. Except as otherwise provided herein, no amendment, modification or termination of any provision of this Agreement shall be effective unless signed in writing by or on behalf of the Company and Investor. No failure or delay on the part of the Company or Investor in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

6.2     <u>Survival of Representations</u>. All representations and warranties contained herein shall survive the execution and delivery of this Agreement.

6.3     <u>Execution of Counterparts</u>. This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which, taken together, shall constitute but one and the same Agreement.

6.4     <u>Binding Effect; Assignment</u>. The rights and obligations of Investor under this Agreement may not be assigned to any other Person.  The Company may assign its rights and obligations hereunder to its successor by operation of law or to an acquirer of all or substantially

all of its assets. This Agreement shall be binding upon, and inure to the benefit of, the Company and Investor and their respective successors and assigns.

6.5     Mutual Waiver of Jury Trial. THE COMPANY AND INVESTOR WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OR RELATED TO THIS AGREEMENT IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY AFFILIATE OF ANY OTHER SUCH PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE. THE COMPANY AND INVESTOR AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

6.6     Choice of Law. This Agreement will be governed and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice of law or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware.

6.7     Venue; Forum. The parties to this Agreement agree that any suit, action or proceeding arising out of, or with respect to, this Agreement or any judgment entered by any court in respect thereof shall be brought exclusively in the courts of the County of New Castle, Delaware, or in the U.S. District Court located in the County of New Castle, Delaware (the "**Designated Courts**"), and hereby irrevocably accept the exclusive personal jurisdiction of those courts for the purposes of any suit, action or proceeding. In addition, each party hereby irrevocably waives, to the fullest extent permitted by Law, any objection which such party may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any judgment entered by any court in respect thereof in the Designated Courts, and hereby further irrevocably waives any claim that any suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

6.8     Further Assurances. The parties hereto shall from time to time execute and deliver all such further documents and do all acts and things as the other party may reasonably require to effectively carry out or better evidence or perfect the full intent and meaning of this Agreement.

6.9     Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, and this Agreement will be reformed, construed and enforced in such jurisdiction so as to best give effect to the intent of the parties under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Subscription Agreement as of the date first written above.

BOMBER LLC

By: _____
Name:
Title:

IQ MANAGEMENT LLC

By: _____
Name:
Title:

**Exhibit 3**

## AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT

### BOMBER LLC

**THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** (this "*Agreement*") dated as of September __, 2012, by and among Bomber LLC (the "*Company*") and those persons whose names and addresses may be set forth and designated as Members in <u>Schedule A</u> attached hereto as the same may be initially set forth or amended or substituted from time to time.

### RECITALS

**A.**     The Company was duly formed as a limited liability company in the State of Delaware on May 6, 2011.

**B.**     In order to regulate the affairs of the Company and the conduct of its business, Ross Anapolle ("*Anapolle*") and Travis Cloud ("*Cloud*"; and, together with Anapolle, the "*Initial Members*") entered into a Limited Liability Company Agreement dated as of June 6, 2011 (the "*Original Agreement*"), pursuant to the Delaware Limited Liability Company Act (the "*Act*").

**C.**     The Company intends to seek additional equity funding; and, in connection therewith, on the date hereof, IQ Management LLC (the "*Investor*") is entering into a Purchase Agreement (the "*Purchase Agreement*"), pursuant to which: (a) the Investor will invest $150,000, on the date hereof (the "*Investment Closing Date*"), in Units of the Company; and (b) the Investor will commit to invest an additional $150,000 in Units of the Company at the request of the Company, all on the terms and conditions set forth herein and in the Purchase Agreement.

**D.**     The Company and the Initial Members desire to amend and restate the Original Agreement to, among other things: (a) restructure the capital of the Company into Units (as defined below); and (b) admit the Investor as a "Member" of the Company, all on the terms and conditions set forth herein and in the Purchase Agreement.

**E.**     The parties hereto desire to enter into this Agreement (and hereby amend and restate the Original Agreement) to effect the actions described above and to provide for the management of the business and affairs of the Company, to define certain rights and obligations of the Members and to establish the Units, all as more fully set forth herein.

**THEREFORE**, the parties agree as follows:

### ARTICLE I

### NAME AND PURPOSES

<u>Section 1a.  Formation</u>

15

105422 v2/BN

The name and address of each of the Members is set forth in Schedule A.  The term "Member" herein shall have the meaning herein as established by Section 18-101 of the Act, and the singular shall include the plural where the context requires.  This Agreement shall constitute an "limited liability company agreement" as defined in said Section 18-101 of the Act.

## Section 1b.  Name and Office

The name of the Company is:

Bomber LLC

The principal office of the Company shall be c/o Ross Anapolle, 31 St. James Avenue, Boston, MA 02116 or such other place as the Manager (as defined in Article V below) may determine, and offices may be maintained and business transacted at any other as the Manager may from time to time determine.

## Section 1c.  Agent

The agent for service of process on the Company is Corporation Trust Company whose address is Corporation Trust Center 1209 Orange street Wilmington DE 19801

## Section 1d.  Purpose.

The purpose of the Company is to develop skis and ski products and skiing services.  The Company may not undertake any other activities unless agreed to by all of the Members from time to time.

## Section 1e.  Powers

In furtherance of its purposes the Company shall, subject only to the limitations contained in this Agreement have all powers which may be held by a limited liability company in Delaware pursuant to the Act and specifically including without limitation the power to enter into contracts for production of products or sales thereof, employment or labor contracts, financing agreements, spaces leases or acquisition of real or personal property or all other powers usual, customary or necessary for the purposes of the Company including all powers which may be held by a limited liability company under the Act.

## Section 1f.  Term

The term of the Company commenced upon filing of the Certificate of Formation required under the Act on May 6, 2011 and shall continue in full effect for an indefinite term unless sooner dissolved pursuant to this Agreement or pursuant to applicable law.

## Section 1g.  Certificate

The Manager is authorized to file any amendments to the Certificate of Formation necessary thereto from time to time with the Secretary of State of the State of Delaware.

**ARTICLE II**

2

105422 v2/BN

## CAPITAL

Section 2a.  Capital of the Company; Units

The names and addresses of the Members of the Company are set forth on **Schedule A** attached to this Agreement.  The Initial Members have previously contributed capital to the Company (in the form cash or agreed value of property, services or other assets) as reflected on the books and records of the Company, which amounts as so specified in said books and records, shall sometimes be referred to herein as the *"**Original Capital Contributions**"*.

Effective as of immediately prior to the Investment Closing Date: (a) the membership interests in the Company represented by the Original Capital Contributions shall be and are hereby restructured, reclassified and converted into the into units (collectively, the "*Units*" and each a "*Unit*"); and (b) in connection therewith, the Original Capital Contributions previously made by the Initial Members shall be restructured, reclassified and converted into the number of Units set forth on **Schedule A**.

Pursuant to this Agreement, the Company may receive additional capital contributions ("*Additional Capital Contributions*") from the Members or from new investors from time to time.  Any such additional capital contributions shall be represented by Units.   The Original Capital Contributions plus such additional capital contributions as are made by Members from time to time are referred to herein as the "*Capital Contributions*".  The Capital Contributions that the Members make to the Company from time to time shall be properly reflected on the books and records of the Company and the Manager shall maintain a unit register as set forth on **Schedule A** to reflect the number of Units related to such Capital Contributions (the "*Unit Register*").  The Unit Register shall be updated and amended from time to time to reflect any issuance of Units related to any Additional Capital Contributions made in accordance with this Agreement.

Section 2b.  Additional Capital Contributions

 Additional Capital Contributions may be made by any Member upon the written agreement of the contributing Member and the Manager, but, except as may otherwise be set forth in a written agreement between the Member and the Company, no Member shall be obligated to make Additional Capital Contributions.  The books and records of the Company, together with the Unit Register, shall be amended from time to time to reflect the extent, if any, to which any Additional Capital Contributions are made by any Member.

Section 2c.  Withdrawals of Capital

 No Member shall have the right to withdraw from the Company any portion of his or her Capital Contribution or to receive any property of the Company except as may be specifically provided in this Agreement.

Section 2d.  Capital Accounts

 There shall be established for each Member a capital account on the books of the Company.

105422 v2/BN

For all purposes of this Agreement, the term *"Capital Account"* shall mean the account established and maintained for each Member which shall be (i) credited with his or her Original Capital Contribution plus such Additional Capital Contributions as the Member may make from time to time, his or her share of "net profits" of the Company as defined in Section 3e, and income which is exempt from taxation, (ii) charged with his or her share of "net losses" of the Company as defined in Section 3e and cash and the fair market value of all property (less any liability secured by such distributed property which the Member assumes or takes subject to) distributed to him or her and expenditures by the Company which are not deductible for tax purposes and are to property chargeable to the capital account, and (iii) shall otherwise appropriately reflect the transactions of the Company and the Members in accordance with the provisions of this Agreement and Treasury Regulations Section 1.704-1(b)(2)(iv). Capital Accounts shall not reflect any elections by a Member under Section 754 of the Code. A transferee of a Member's interest shall succeed to the Capital Account attributable to the transferred interest. Any Member's capital account shall be credited by any amount of such Member's separate funds contributed (and not loaned) to the Company for the repayment of any debt of the Company.

Section 2e.  Additional Members; Changes of Form; Dilution

The Manager shall have the power: (i) to create additional classes of membership interests of the Company; (ii) to authorize and issue Units and receive (or cause the Company to receive) Capital Contributions in connection therewith; (iii) to restructure the capital of the Company or the existing membership interests in the Company; (iv) to change its form to a corporation or other form and (v) to admit additional Members to the Company or convey other equity or debt interests in the Company on such terms and for such Capital Contributions as the Manager shall deem necessary, in the Manager's sole and absolute discretion. In the event of admission of any additional members to the Company including the creation of any additional classes of Members or other forms of capitalization the interests of the Members hereunder shall be diluted in such manner and in such amounts as the Manager shall determine. The Manager may grant pre-emptive rights to Members to acquire additional or proportionate interests in the Company, and in the event such pre-emptive rights are granted they shall be granted to all Members and upon such terms and conditions as the Manager shall determine to be in the best interests of the Company.

## ARTICLE III

## PROFITS, LOSSES AND DISTRIBUTIONS

Section 3a.  Allocation of Net Profits, Net Losses and Tax Credits

"Net profits" and "net losses" both as defined in Section 3e and any tax credits to which the Company may be entitled shall be allocated and credited among the Members so that, if the assets of the Company are liquidated and the proceeds thereof distributed in accordance with Section 3c the aggregate amount of all distributions made pursuant to Sections 3b and 3c would have been made in accordance with the capital accounts of the Members.

Section 3b.  Distributions of Cash Flow

105422 v2/BN

The "Cash Flow", as defined in Section 3e hereof, to the extent available to the Company, shall be distributed in such amounts and at such intervals as the Manager may deem appropriate as follows;

First:  To the repayment including prepayment of loans to the Company from the Manager or Members;

Second:  To the Members in proportion to their number of Units as shown on Schedule A as amended from time to time.

To the extent that there are net profits for any fiscal year, Cash Flow distributions to the Members shall be deemed to be made first from said net profits. Any Cash Flow distribution to a Member in excess of the said net profits shall be deemed to be an adjustment of capital.

Section 3c.  Distribution of Capital Proceeds

"Capital Proceeds", as defined in Section 3e shall be distributed and applied (after the payment of mortgages, debts, loans, expenses, and such reserves, as the Manager determines appropriate) in the following order of priority:

First:   To the Members to the extent of their unrecouped capital contributions as defined in Section 3e;

Second:  To the Members in proportion to their interests as shown on Schedule A as amended from time to time.

Section 3d.  Minimum Gain Chargeback

Notwithstanding the provisions of Section 3a if in any year there shall occur a net decrease in the Company's "Minimum Gain" as defined in Treasury Regulations Section 1.704-2, then net profits of the Company to the extent of such decrease in Minimum Gain shall be allocated to the Members in the same proportions as "net profits" as provided in Section 3a.

Section 3e.  Definitions

(i)     The terms "net profits" and "net losses" as used herein shall mean, respectively, the annual net income or net loss of the Company determined by the accountants retained by the Company.

(ii)    The term "cash flow" as used herein shall be the annual net profits or net losses of the Company arising from operations adjusted by:

(a) Subtraction of a contribution to operating and capital reserves of an amount determined in the discretion of the Manager;

(b) Adding all amounts claimed for depreciation and other deductible items not involving the expenditure of cash and any other cash receipts of the Company, regardless of the source, excepting loan proceeds, capital contributions and Capital Proceeds; and

5

105422 v2/BN

(c)  Subtracting any amounts paid by the Company during such periods for loan principal amortization or for capital purchases or improvements not deductible for federal income tax purposes in the year paid, the non-cash portion of any profits of the Company during such period, and the amount of any reasonable reserves established by the Manager in her sole discretion to cover reasonable business needs.

(iii)  The term "Capital Proceeds" means proceeds resulting from refinancing, sale, exchange or condemnation, casualty loss, or other disposition of all or part of the property or rights of the Company or from the liquidation of the Company following dissolution.  A capital transaction is a transaction from which Capital Proceeds may be derived, whether or not in fact derived.

(iv)  The term "year" as used in this Article III shall mean the fiscal year of the Company, which shall be a calendar fiscal year unless otherwise determined by the Manager.

(v) The term "unrecouped capital contribution" means a Member's Original Capital Contribution as set forth in Schedule A, as increased by Additional Capital Contributions, if any, made by such Member, and reduced by the sum of (i) distributions of cash flow under Section 3b Second distribution and (ii) distributions of "Capital Proceeds" under Section 3c First distribution.

## ARTICLE IV

### LIABILITY OF MEMBERS

Subject to the provisions of the Act, no Member shall be personally or individually liable for any debts, obligations or losses of the Company beyond his or her contribution to the capital of the Company or any separate guarantees of Company obligations executed by such Member.

## ARTICLE V

### RIGHTS, POWERS AND DUTIES OF THE MANAGER AND THE MEMBERS

Section 5a.  Management, Appointment of Manager, Certain Fees

(i)  Anapolle, a Member of the Company, is hereby appointed, ratified and reaffirmed as the sole manager of the Company (the "*Manager*"), who shall serve as the "manager" of the Company as defined in Section 2 of the Act.  In the event of the death or incapacity of Anapolle his personal representative shall appoint a successor Manager of the Company.

(ii)  The Manager shall have the exclusive right and power to direct the overall operation of the Company and to do all things deemed by the Manager necessary to carry on the business and purposes of the Company as described in ARTICLE I, including but expressly not limited to, the right and power (i) subject to the limitations contained in Section 5a (iv) to acquire, produce, sell, lease, or otherwise dispose of all or any part of the property owned or to be owned by the Company, real and personal or any interest therein or right with respect thereto; (ii) to enter into contracts including without limitation for provision of sales, marketing, manufacturing, consulting, legal, accounting, brokerage or other services related to the Property; (iii) to execute, modify, or terminate contracts for production, marketing and sales of the Company's products or

consulting services in connection therewith; (iv) to borrow money in furtherance of the purposes of the Company and to secure the same by the assets of the Company; (v) to cause the Company to become a partner or venturer in any Company or joint venture formed to carry out a business in which the Company may engage; (vi) to merge the Company with any other Company whether or not the Company is the survivor by merger; to dissolve the Company, except as otherwise provided herein; (viii) to enter into any kind of activity and to perform and carry out contracts of any kind which the Manager deems appropriate with respect to or incidental to the accomplishment of the business and purposes of the Company; provided that such contracts may be lawfully carried on or performed by a limited liability company under the Act.

(iii)   The Manager shall devote to the Company such time which may be less than full time as the Manager reasonably may deem as necessary for overseeing the affairs of the Company. The Manager shall be entitled to be paid fees or a salary from the Company which is commensurate with the obligations undertaken by the Manager and determined in the discretion of the Manager.

(iv)   The Manager shall be empowered to execute all amendments to this Agreement and any necessary certificates thereto in furtherance of exercise of the powers of the Manger under Section 2e hereof.

(v)    The Members shall not, in their capacity as Members, take part in the management of the business or transact any business for the Company, and they shall have no power to sign for or to bind the Company in their capacity as Member, provided, however, that should any Member at any time also be a Manager such person may sign for and bind the Company in his capacity as a Manager.

(vi) The Manager shall have the right to appoint a new person or entity as Manager of the Company and in connection with such appointment to resign as Manager.

Section 5b.  Other Activities of the Members

The Manager may, in conducting the business of the Company engage on behalf of and at the expense of the Company any broker, employee, consultant, attorney, accountant, or other agent, including himself or any affiliate, which he deems advisable; and the fact that the Manager is directly or indirectly interested in or connected with any such person or entity having dealings with the Company shall not affect the validity of such dealings or give to the Company or the Members any interest in the profits derived therefrom by the Member; provided, however, that the charges for any services performed for, or other business transacted with, the Company by the Manager or affiliate thereof shall be determined by the Manager to be comparable with the fees and rates prevailing in the area concerned.

Section 5c.  Bank Accounts

The funds of the Company shall be deposited in such bank accounts as shall be designated and maintained by the Manager from time to time.  Withdrawals of Company funds from such accounts shall be made upon such signatures as the Manager designates.

Section 5d.  Indemnification of Manager

7

The Company shall indemnify the Manager against any claims, liability, damage or costs (including reasonable attorneys' fees) incurred by the Manager in the conduct of the business of the Company up to the amount of the Company's assets, and neither the Company nor any Member shall have any claims against a Manager for any acts or omissions if the same were performed in good faith on behalf of the Company.  The Manager is expressly not obligated to any Members (as Members) to make payment of any Company obligations (including mortgage encumbrances) other than from available Company funds.

## Section 5e.  Loans from Managers

The Manager or any Manager may but shall not be obligated to advance any monies to the Company in addition to the Manager's Capital Contributions as a Member set forth in Schedule A.  The Manager may loan necessary funds to the Company with interest at the rate of twelve (12.00%) percent per annum and upon terms which are commercially reasonable in view of the business and financial condition of the Company, and such loans shall be evidenced by promissory notes of the Company in favor of the Manager or Member as the case may be and executed by the Manager.  As of the date of this Agreement the Manager has loaned to the Company fifty thousand and no/100 ($50,000.00).

## Section 5f.  Accounting Records and Reports

The Manager shall cause to be kept proper books of account reflecting Company activities.  These books may, in the discretion of the Manager be kept in accordance with generally accepted accounting principles and shall be open to inspection by the Members at reasonable times.  The Manager shall furnish to the Members all income tax information necessary for reporting individual income.  The accounts of the Company shall be compiled annually by an accountant selected from time to time by the Manager.

## Section 5g.  Tax Matters

Anapolle is designated as the "Tax Matters Partner" of the Company to the extent such designation applies to a Member of the Company.

## ARTICLE VI

## TERMINATION AND LIQUIDATION

## Section 6a.  Events Causing Termination; Continuation;

(i)      The Company shall be dissolved and its affairs settled upon the occurrence of any of the following:  (a) the sale or other disposition of all the Property; (b) the expiration of its term; or (c) as otherwise provided in this Agreement, and/or as otherwise provided by law.

(ii)      The death, insanity, dissolution, liquidation, bankruptcy or receivership of a Member shall cause such Member to cease to be a Member hereof and shall be deemed to be an act of withdrawal.  The successor, assign receiver or personal representative of the Member shall not be a Member but shall be an assignee of a member subject to the provisions of Section 7d.

105422 v2/BN

(iii)   The withdrawal of a Member pursuant to section (ii) shall not constitute a termination of the Company, provided at least one Member remains and agrees to continue the Company.

Section 6b.  Distribution upon Termination

(i)   Upon termination, the Company's Certificate of Organization shall be canceled in accordance with the provisions of the Act, and the Manager shall promptly notify all the Members of such termination.  After adequate provision has been made for the payment of the debts and obligations of the Company, including but not limited to the expenses of liquidation and the repayment of any loans or other obligations due to any Member and provision for reserves, the Company assets shall be distributed to each of the Members in accordance with the provisions set forth in Section 3c.

(ii)   If any non-cash assets of the Company shall be distributed in kind, such assets shall be distributed on the basis of the then fair market value thereof and such assets shall be distributed to the Members entitled thereto as tenants-in-common in accordance with their respective interests therein.

## ARTICLE VII

## ACQUISITION AND TRANSFER OF MEMBERSHIP INTERESTS

Section 7a.  Investor Qualification Representations

Each Member acknowledges that in acquiring his or her interest as a Member he is not relying on any warranty or representation, oral or written, by the Company, by any Manager, or by any other person or entity.  Each Member represents to the Company that (i) he/she is sufficiently familiar with the business of the Company to be able to make a knowledgable investment in the Company, (ii) he/she is aware that the Company has no history of operations and is in a start-up phase with significant risk, and (iii) he/she is in a financial position so that his or her investment in the Company is not a substnatial portion of his/her assets and the risk involved in the Company is comensurate with his/her financial position.

Section 7b.  Investment Representations

Each Member represents that he or she is acquiring or has acquired his or her interest in the Company for his or her own account, for investment and not with a view to, or for resale in connection with, any distribution thereof or the grant of any participation therein.  Each Member agrees that notwithstanding any other provision of this Agreement, such interest may not be sold, pledged, or otherwise transferred unless (1) a registration statement with respect to such interest shall be effective under the Securities Act of 1933 (the "Securities Act"), and any other applicable Federal or State law, or (2) the Manager shall have received a satisfactory opinion of counsel designated by the Manager that an exemption from registration under such Securities Act and any other applicable laws is then available, and that, in any event the transfer of any interest or the substitution of another Member is subject to the sole discretion of the Manager. With respect to the transfer or attempted transfer of a Member's interest hereunder, or that of a subsequent holder thereof, each Member will indemnify the Company and the Manager, jointly and severally, against any damages, costs or liabilities, including attorney's fees, arising from or related to any violation or alleged violation of the Securities Act of 1933, state securities laws,

9

other laws, or this Agreement. Each Member understands that the Company is under no obligation to register interests in the Company under the Securities Act or to comply with any exemption under the Securities Act necessary to enable a Member to sell his or her interest under the Securities Act, and that there is no public market for interests in the Company.

## Section 7c.  Transferability of Membership Interests

(i)     Except as provided in subparagraphs (ii) of this Section 7c, no Member may transfer, sell, alienate, pledge, assign or otherwise encumber or dispose of ("*assign*") all or part of his or her interest in the Company, whether voluntarily, involuntarily, or by operation of law, or at a judicial sale or otherwise, without prior written consent of the Manager, which consent may be withheld at the sole discretion of the Manager.

(ii)    The prior written consent of the Manager shall not be required, however, for the assignment by a Member of all or any part of his or her interest in the Company in accordance with this Agreement or otherwise to:

(a)  any other Member or the immediate family of any Member;

(b)  the legal representatives of a deceased or incompetent Member;

(c)  any person who takes an interest in the Company by reason of the settlement of the estate of a deceased Member.

(iii)   If a Member wishes to sell his or her interest to a non-Member except in a sale permitted by section (ii), he must first make an offer in writing to the other Members for a price equal to the greater of $100.00 or the unrecouped capital contribution of the selling Member. The other Members, within thirty (30) days after the receipt of such offer, may accept or reject the same. Any such Member wishing to purchase such interest shall do so by depositing with the Manager, to be paid to the selling Member, the amount or price at which the selling Member is obligated to sell. If no Member shall elect to purchase the interest so offered, the selling Member may sell the same.

(iv)    Notwithstanding any other provision hereof, the Company and Anapolle shall each have the right at any time on or prior to May 31, 2016,  upon ten (10) days' notice to Cloud to purchase, the entire Membership interest of Cloud free and clear of any encumbrances for a purchase price calculated so that at the time of acquisition Cloud or the holder of his interest shall receive an amount equal to the sum of: (I) the Original Capital Contribution paid by Cloud as reflected on **Schedule A** *plus* (II) interest on such amount compounded annual rate of return of twenty-five (25%) percent per annum.

(v)     No sale or exchange of any Member's interest in the Company may be made if the interest sought to be sold or exchanged, when added to the total of all other interests sold or exchanged within the period of twelve (12) consecutive months prior thereto, would, in the opinion of counsel for the Company, result in the termination of the Company under Section 708 of the Internal Revenue Code (or any successor statute).

10

(vi)   In no event shall all or any part of a Member's interest in the Company be assigned in violation of this Section, or to a minor or incompetent, and any such attempted assignment shall be void and ineffectual and shall not bind the Company.

Section 7d.  Assignees Becoming Members

(i)   No Member shall have the right to substitute an assignee as Member in his or her place. The Manager may in her sole discretion permit such assignees to become Members, and any such permission by the Manager shall be binding and conclusive without the consent or approval of any other Members.

(ii)   An assignee of all or a portion of the interest of a Member or any assignee of such assignee who does not become a Member shall have the right to receive the same share of profits, losses and distributions as the assigning Member would have been entitled to receive with respect to such interest if no such assignment had been made.

## ARTICLE VIII

## GENERAL PROVISIONS

(a)  No interest shall be paid on any capital contributed to the Company, except as otherwise expressly set forth herein.

(b)  No Member may withdraw from the Company unless (a) he or she shall have assigned his/her entire interest in the Company in accordance with Section 7c or (b) the Company shall be terminated, dissolved and wound up.

(c)  Third parties dealing with the Company may rely conclusively upon the power and authority of the Manager to bind the Company.

(d)  Each Member hereby irrevocably appoints and empowers Ross Anapolle his or her true and lawful attorney in his or her name, place and stead, to make, execute, acknowledge and file all instruments or documents of any kind which Anapolle  as Manager may deem necessary or appropriate to carry out the intention and purpose of this Agreement, including, but not limited to, all necessary business certificates and Certificates of Organization, amendments thereto on the cancellation thereof.  It is expressly intended by each Member that the foregoing power of attorney is coupled with an interest, and that it shall survive the assignment by any Member of the whole or any part of his or her interest hereunder.

(e)  In the event of a transfer of all or part of an interest of a Member at a profit, the Company shall elect pursuant to Section 754 of the Internal Revenue Code, as amended, to adjust the basis of the Company's property; provided, however, that the Manager may revoke such election for such periods and at such times as the Manager shall determine to be most advantageous to a majority in interest of the Members.

(f)  This Agreement shall be binding upon and inure to the benefit of the respective parties, their heirs, personal representatives, successors and assigns, and shall be construed in accordance with the laws of the Commonwealth of Massachusetts.

11

(g) All notices sent or required to be sent hereunder shall be in writing and shall be delivered in hand or sent by registered or certified mail, return receipt requested, to the address shown on Schedule A hereto, unless all Members have otherwise been notified in writing.

(h) The headings of the Articles hereof are for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

(i) This Agreement may be amended, modified, supplemented or terminated with the written consent or approval of Members holding a majority of the Units then outstanding.  Any such amendment, modification, suppliment or termination effected by a majority of the holders of Units in accordance with the immediately preceding sentence shall be binding on all of the Members, whether or not such Members have consented to it or approved it.

(j) This Agreement and all amendments hereto may be executed in one or more counterparts (including, the execution of separate signature pages) and each counterpart shall, for all purposes, be deemed an original, but all such counterparts shall together constitute but one instrument.

(k) Where the context so requires herein, the masculine shall include the feminine and the plural shall include the singular.

(l) This Agreement sets forth the entire agreement and understanding among the Members and supersedes all prior agreements and understandings with respect to the subject matter hereof.

IN WITNESS WHEREOF, the parties have hereunto set their respective hands and seals as of the date first above written.

**MEMBERS**

Signature:

Ross Anapolle
131 St. James Avenue
Boston, MA  02116

Address

Signature

Travis Cloud
102 Jefferson Street Unit 1
Hoboken, NJ 07030

Address

IQ MANAGEMENT LLC

By:
Name:    STEFAN KALLABIS
Title:      Director

Address      100 Lincoln Rd
Miami Beach, FL 33139

12

105422 v2/BN

## SCHEDULE A

|  | COLUMN I<br><br>DISTRIBUTION OF PROCEEDS, PROFITS, LOSSES AND CASH FLOW | COLUMN II<br><br>NUMBER OF UNITS |
|---|---|---|
| **MEMBERS** |  |  |
| Ross Anapolle<br>31 St. James Avenue<br>Boston, MA 02116 | 90.00% | 2,565,000 |
| Travis Cloud<br>102 Jefferson Street, Unit 1<br>Hoboken, NJ 07030 | 4.7368 | 135,000 |
| IQ Management LLC<br>100 Lincoln Rd<br>Miami Beach, FL 33139 | 5.2632 | 150,000 |
| **TOTAL** | **100%** | 2,8 |

105422 v2/BN