## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IQ MANAGEMENT, LLC,<br>        Plaintiff,<br><br>v.<br><br>ROSS ANAPOLLE, in his capacity as<br>Manager of Bomber, LLC; and BOMBER, LLC,<br>a Delaware Limited Liability Company,<br>        Defendants. | CIVIL ACTION<br>CASE NUMBER 1:13-cv-10539<br><br><br>**DEFENDANT'S MOTION TO<br>DISMISS PURSUANT TO<br>FED. R. CIV. P. 12(b)(6)** |

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS

RICHARD N. GOTTLIEB
BBO # 547970
ALEX R. HESS
BBO # 679957
DANIELLE M. CALLAHAN
BBO# 684908
*Counsel for the Defendants*
The Law Offices of Richard N. Gottlieb
Eleven Beacon Street, Suite 325
Boston, Massachusetts 02108
Telephone: (617) 742-4491
Facsimile:  (617) 742-5188
Email: Rnglaw@verizon.net
        Arh.gottlieblaw@verizon.net
        Dc.gottlieblaw@verizon.net

## I. PRELIMINARY STATEMENT.

Accordingly, Defendants Anapolle and Bomber, LLC respectfully submit this memorandum in support of their Motion to Dismiss Plaintiff's Complaint for failing to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), and for failing to comply with the heightened pleading standards required by both Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA") for pleading securities fraud, and the First Circuit's policy of applying strict standards to securities fraud complaints in an effort to avoid and dissuade vexatious and frivolous litigation.

## II. BACKGROUND.

For the past twenty (20) years, Ross Anapolle has been a dentist at Anapolle & Associates, an established family dental office, with offices in Boston, and Waltham, Massachusetts.  Right around the time Ross Anapolle ("Anapolle") graduated from Harvard Dental School with a Doctorate in Dental Surgery (DDS), his father, the prior owner and head dentist at Anapolle & Associates, passed away.  Since that time, Anapolle has owned a dental practice, and practiced dentistry as a dental surgeon in Boston.

For most of his life, Anapolle enjoyed skiing, and after years of practice, became an expert skier.  During winters, Anapolle traveled to Stowe, Vermont, and various ski areas in Colorado and other states.  Through his many ski trips, Anapolle formed connections and relationships with avid and expert skiers, as well as ski manufacturers.

In 2010, during various ski trips, Anapolle started discussions with his friends and ski experts about starting a high-end ski business.  With the help of his connections, he would offer hand-made top quality skis from Italy to customers in the U.S.  Once Anapolle had an agreement in place with the Italian ski manufacturer, he created Bomber – his ski company.  As an initial

capital contribution, Ross Anapolle provided $50,000.00, and maintained a 90% ownership in the business.  His friend, Travis Cloud, invested $25,000 into the company in return for a 10% ownership interest in the startup business.  On May 6, 2011, Anapolle filed a Certificate of Formation with the Secretary of State's Office in Delaware – and Bomber, LLC was formed. Exhibit A: Bomber, LLC Delaware Certification.

Bomber's beginnings were humble: a one-man LLC, roughly $75,000 in start-up capital, and no real point of sale for selling high-end skis.  Not to mention the high costs of operation.  It is expensive to order hand-made skis in Italy, and then ship them to the U.S.  However, despite the meager beginnings, Bomber began to sell these high-end skis at exponential rates.  By using his many connections made through years of skiing, and literally driving to ski hot sports and selling skis out of his vehicle, Anapolle sold skis and was able to increase the awareness of his fledgling company.  Over the next couple of months, Anapolle established a Bomber website and a point of sale that was easily accessible to the many avid skiers interested in these high-quality skis.  Exhibit B: Bomber Website Homepage; Exhibit C: Bomber Gear For Sale Page.  On top of the website, Anapolle entered into distribution and consignment agreements with numerous well-established and known ski retailers: Skiershop in Stowe, Vermont; The Forerunner Ski Shop, Killington, Vermont; and Paragon Sports, New York City.  Exhibit D: Bomber Ski Dealers; Exhibit E: Article on Skiershop partnering with Bomber.

Since its inception, this small ski company has had some amazing achievements. Bomber is an official ski supplier to both the U.S. Ski Team and the Canadian Ski Team (Alpine Canada).  Exhibit B: Bomber's Website; Exhibit F: The U.S. Ski Team's website listing official suppliers; Exhibit G: The Canadian Ski (Alpine Canada) Team's website listing official suppliers; Exhibit H: Bomber's Gallery showing a U.S. Ski Team member using Bomber's skis.

Partnering as a supplier to the U.S. and Canadian ski teams and significantly raised Bomber's awareness and sales, and more importantly, legitimizing the small company.  Bomber has also used philanthropic partnerships to market Bomber and its skis.  Some of these philanthropic ventures include providing skis and lessons to the New York Yankees Foundation (the Yankees non-profit foundation that benefits the Boys & Girls Clubs in greater New York City), The Special Olympics, and The Vermont Ski and Snowboard Museum.  Exhibit I: Article on Bomber Skis in Stowe Reporter.  Aside from its charitable commitments, Bomber also entered into agreements for customized ski orders from large and well-known companies, including: Polo by Ralph Lauren, Google, New Balance, Vineyard Vines, J. Crew, and many other large companies. See Exhibit J: Custom-order Bomber skis.  Additionally, Bomber has exclusive licenses from top New England colleges to provide customs skis, most notably, Middlebury College.  Exhibit K: Middlebury College Campus Store Bomber Skis Point of Sale.

Over the past two (2) years, Bomber has grown by leaps and bounds, and the small company, with limited and already committed assets, needed capital to pay for, and ship skis from Italy to fulfill existing orders.  In 2012, Anapolle began to actively seek and recruit investors for Bomber, in order to increase the company's capital and grow the business.  On September 13, 2012, Anapolle met with the principals of Plaintiff IQ Management, Stefan Kallabis and Brian Lederman, along with Karina Rabayeva and Robert O. Colorina.  During this dinner, IQ Management's principals and these other people provided Anapolle with their business cards.  Exhibit L: Business cards from the September 13, 2012 dinner.  During this dinner, Lederman and Kallabis bragged and regaled Anapolle on their numerous investments, history of success in private equity, mutual funds, and investing in other companies.  Lederman claimed to be a "whiz" with investments and choosing companies based on his years of

experience, while Kallabis bragged about his billions of dollars, and the thrill of investing in small start-up businesses and watching his money grow.

As dinner progressed, appetizers turned to entrées, and the topic of discussion turned to skiing, a common passion that all the investors and Anapolle had in common.  They shared stories of skiing challenging slopes in Vermont, and Colorado.  Anapolle then shared with the potential investors the prospect of investing in his growing ski business.  Anapolle then introduced the dinner party to Bomber's skis by showing it to them on his iPhone.  He also stated that Bomber had recently been accepted as an official supplier for both the U.S. Ski Team and the Canadian Ski team.  Anapolle told Lederman and Kallabis that since his business started, orders for his hand-made skis were growing exponentially, and on track to double in the coming year.  This was due to the increasing interest and awareness of Bomber skis, large orders placed by corporate entities, and growing recognition of Bomber skis by numerous expert skiers.

After discussing the growth potential for Bomber and showing many pictures of his custom skis to the dinner party, Lederman and Kallabis stated that the prospect of investing in Bomber sounded exciting and that they were very interested.  When Kallabis asked when Bomber would be willing to accept an investment, Anapolle stated that Bomber was currently seeing investors, and that once each side's attorneys drew up and reviewed paperwork, Bomber would be ready to accept IQ Management's investment.  At the end of the dinner, Lederman mentioned a Mr. Anapolle from Boston, who had recently married.  Anapolle (defendant) mentioned that he knew him and was related to him either as a first or second cousin.

Shortly after the September 13, 2012 dinner, Kallabis, on behalf of IQ Management, requested that Anapolle have Bomber's attorney send over a subscription agreement so that IQ Management's attorneys could review it.  After receiving this request Anapolle discussed the

investment with Bomber's corporate attorney, and a subscription agreement was drafted.  This subscription agreement was sent to Lederman and Kallabis for review by their attorneys.

On September 25, 2012, at 5:51 p.m. Eastern Standard Time (EST), Lederman emailed Anapolle a copy of the executed Subscription Agreement (Exhibit 2 to the Plaintiff's Complaint).[1]  Exhibit M: Sept. 25, 2012 Email from Lederman to Anapolle.  Under the agreement, IQ Management agreed to invest $150,000.00 in exchange for a roughly 5% ownership interest in Bomber, LLC.  The next day, after receiving the executed agreement and confirmation of the investment, Anapolle asked Kallabis to confirm when IQ Management would have the agreed upon amount of $150,000.00 to deposit into Bomber's bank account.  Kallabis then called Anapolle and bragged about having significant liquid assets, money in various accounts, and that the $150,000.00 was "a drop in the bucket" for him considering his vast wealth.  To show his good faith and confirm his claims, Kallabis then emailed Anapolle a screenshot of his iPhone with his bank accounts, showing he had a large amount of funds available to invest into Bomber, LLC.  Exhibit N: Kallabis Screenshot of Available Funds.

Between September 25, the date IQ Management invested in Bomber and executed an agreement to that effect, and October 9, 2012, IQ Management deposited into Bomber's operating account at TD Bank a total of $150,000.00 from various Swiss bank accounts.  See Exhibit O: Advice for Deposit of $35,000.00 to Bomber's Account.

Since receiving IQ Management's investment, Anapolle has operated Bomber as its Manager, along with the help of two independent contractors to assist him in taking orders, preparing shipping orders, and promoting Bomber skis.  However, not long after making its

---

[1] This date is important for two reasons: (1) As of this date, IQ Management had decided to invest in Bomber, LLC, and executed an agreement to that effect; and (2) all alleged misrepresentations or omissions claimed after September 25, 2012, are irrelevant and cannot be the basis for plaintiff's claim of securities fraud since the plaintiff had already decided and agreed to invest in the company.

investment, IQ Management made its intention known to buy out and control the entire company from Anapolle.  As soon as mid-October, 2012, Kallabis repeatedly left messages for Anapolle requesting a valuation of the entire business so he could submit an offer to purchase the entire company.  Anapolle refused to provide information for this purpose so IQ Management began to harass Anapolle, and threaten legal action.

As tensions mounted, Anapolle carried on Bomber's business, operated the company, accepted ski orders, shipped skis to customers, and continued to promote the business during the busy winter months – the height of ski season.  However, in the meantime IQ Management was plotting a hostile takeover.

On February 12, 2013, IQ Management, through counsel, sent a letter to Anapolle claiming to have usurped control of Bomber, LLC and demanded that Anapolle relinquish control of the company he built from the ground up.  Exhibit P: IQ Management's Demand Letter to Bomber and Minutes.  On February 14, 2013, Lederman along with IQ Management's representatives entered a branch of TD Bank in Florida.  These individuals showed a bank branch manager a copy of IQ Management's Demand Letter and the attached corporate minutes.  In doing so, TD Bank froze Bomber, LLC's operating accounts, and IQ Managements attempted to have all funds released to Lederman.  After receiving a call from TD Bank notifying him of the change in name and situation, Anapolle immediately reported the incident to TD Bank and requested that the accounts be frozen.  To date, TD Bank is holding these funds in a bank account, in the name of Bomber, LLC, and the account is frozen pending litigation.

In addition to freezing most of Bomber, LLC's assets, IQ Management submitted a bid to purchase Anapolle's 90% interest in Bomber, LLC just two weeks after the filing of this suit.  In Ross Anapolle's personal joint Chapter 7 Bankruptcy with his wife, Anapolle's 90% interest in

Bomber, LLC is an asset of the bankruptcy estate, and eligible to be liquidated by the Chapter 7 Trustee, Stewart Grossman.  Only days after filing this securities fraud action, IQ Management submitted an offer to purchase Anapolle's 90% interest in his company for a mere $10,000.00. The relatively low offer takes into account pending litigation (i.e. the instant securities fraud case).  Exhibit Q: IQ Management's Offer to Purchase Anapolle's Bomber Interest.

## IV. ARGUMENT.

**A. IQ MANAGEMENT'S COMPLAINT MUST BE DISMISSED BECAUSE IT FAILS TO PROVIDE SUFFICIENT FACTUAL ALLEGATIONS TO SET FORTH A PLAUSIBALE CLAIM FOR SECURITIES FRAUD.  MORE IMPORTANTLY, THE PLAINTIFF'S OWN PLEADING AND EXHIBITS SHOW AFFIRMATIVE EVIDENCE OF NON-RELIANCE, AND A COMPLETE LACK OF EVIDENCE OR INFORMATION TO SUPPORT THEIR BASELESS ALLEGATIONS.**

### 1. The Legal Standard for a Securities Fraud Action.

In order to survive a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level," and in fact requires Plaintiffs to plead facts sufficient to make their alleged conclusions "plausible."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2008).[2]  In considering the merits of a motion to dismiss, the court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken.  Nollet v. Justices of the Trial Court of Mass., 83 F. Supp. 2d 204, 208 (D. Mass. 2000), *affirmed*, 248 F.3d 1127 (1st Cir. 2000).  Furthermore, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  Langadinos v. American Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000).  If the facts in the complaint are sufficient to state a plausible cause of action, a motion to dismiss the complaint must be denied.  See Nollet, 83 F. Supp. 2d at 208.

In addition to being plausible and satisfying the pleading requirements as articulated in Twombly, a claim for securities fraud must also comply with Fed. R. Civ. P. 9(b) and satisfy the exacting requirements of the Private Securities Litigation Reform Act ("PSLRA").  Fed. R. Civ.

---

[2] A claim that implicates securities law requires a heightened pleading requirement.  Under both Rule 8 and 9 of the Federal rules of Civil Procedure and the Private Securities Litigation Reform Act of 2995 ("PLSRA"), 109 Stat. 737, as interpreted by the Supreme Court, Plaintiffs are required to plead facts sufficient to make their alleged conclusions "plausible."  Bell Atlantic Corp. v. Twombly 550 U.S. 544, 570 (2008).

P. 9(b) mandates that Plaintiffs "must state with particularity the circumstances constituting fraud or mistake."  PSLRA demands that a Plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  To qualify as *strong*, the "inference must be more than merely plauisible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007) (noting the "[e]xacting pleading requirements" of the PSLRA).

### 2.  Elements of Securities Fraud under Rule 10b-5.

Plaintiff IQ Management brings claims for violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 against Anapolle and Bomber, LLC.  The Exchange Act establishes the protections against securities fraud.  Section 10 of the '34 Act provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
> . . .
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
> 15 U.S.C. § 78j(b).

The implementing regulation for this section of the '34 Act, Rule 10b-5, makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b-5.

While Rule 10b-5 does not explicitly provide for a private right of action, the Supreme Court has implied the right "which resembles, but is not identical to, common-law tort actions for deceit and misrepresentations." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341 (2005).

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately plead six elements:

(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.
Miss. Pub. Emples' Ret. Sys. V. Boston Scientific Corp., 523 F.3d 75, 85 (1st Cir. 2008) (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)).

### 3. Plaintiff's Failure to Adequately Set Fort Factual Allegations and Supporting Evidence for Misrepresentations or Omissions.

IQ Management has absolutely no securities fraud claim against Bomber, LLC or Anapolle because the statements made, and presented in the Complaint, are true and accurate. Even going beyond this most fundamental failure in the plaintiff's claim, there are no particular facts that render the representations false – simply stating "this is false" does not even come close to the heightened pleading standard for misrepresentation in a securities fraud action. Moreover, the Plaintiff has failed to show material misrepresentations or omissions coupled with the required intent to defraud, scienter. Therefore, the complaint and this civil action must be dismissed.

An essential tenet of securities fraud law is that a defendant cannot be liable for an affirmative false statement if the statement is, in actuality, *not false*. Capri Optics Profit Sharing v. Digital Equip. Corp., 950 F.2d 5, 9-10 (1st Cir. 1991) ("indisputably true, and wholly true" statements are not actionable); see also Guerra v. Teradyne, Inc., 2004 U.S. Dist. LEXIS 28548, 26 (D. Mass. 2004) (where plaintiffs have failed to establish the falsity of statements, a claim of fraud must fail). In addition to claiming that representations were false, the PSLRA requires that all allegations of fraud must set forth "each statement alleged to have been misleading, the reason or reasons why the statements is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The First Circuit's application of PSLRA is "notable strict and rigorous in applying the Rule 9(b) standard in securities fraud actions, and thus the plaintiff must "not only allege the time, place, and content of the alleged misrepresentations with specificity, but also the factual allegations that would support a reasonable inference that adverse circumstances existed at the time of the offering, and were known and deliberately or recklessly disregarded by defendants."[3] Greebel v. FTP Software, Inc., 194 F.3d 185, 193-94 (1st Cir. 1999).

To survive a motion for dismissal, a complaint for securities fraud must contain, at a minimum, factual allegations and supporting evidence relied upon that show statements made were false, or that omitted statements should have been disclosed, that the statements or omissions were material to the purchase or sale of securities, and a strong inference that all

---

[3] The First Circuit's rigorous pleading standards alleviate concerns that "plaintiffs will bring baseless strike suits against securities defendants in order to increase settlement amounts or to engage in a fishing expedition for evidence on which to base their claims." Suna v. Bailey Corporation, 107 F.3d 64, 73 (1st Cir. 1997). Due to these concerns and the heightened pleading standards for securities fraud, factual allegations require evidentiary support and a basis supporting their veracity. Romani v. Shearson Lehman Hutton, 929 F.2d 875, 878 (1st Cir. 1991) ("Where allegations of fraud are . . . based only on information and belief, the complaint must set forth the source of the information and the reasons for the belief.").

statements or omissions were made with an intent to deceive, manipulate and defraud. The securities fraud two elements that are subjected to the strictest scrutiny under Rules of Civil Procedure 9(b) are (1) whether there was a material misstatement or omission by the defendant, and (2) whether there was scienter. Colby v. Hologic, Inc., 817 F. Supp. 204, 209 (D. Mass. 1993).

Misrepresentations are actionable "only if the misstated or omitted fact was 'material,' that is, 'only if a reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information made available.'"[4] Gross v. Summa Four, Inc., 93 F.3d 987, 992 (1st Cir. 1996), *quoting* Basic, Inc. v. Levinson, 485 U.S. 224, 232 (1988). A misrepresentation is material to a claim of securities fraud "only if the misstated or omitted fact was one likely to be viewed by the reasonable investor as significantly altering the total mix of available information." TSC Industries, Inc. v. Northway, 426 U.S. 438, 445 (1976) (finding that omitted statements as to a company's control by another company on a public disclosure document was not a material omission). All alleged misrepresentations and omissions must be coupled with scienter, or at least strong inferences of an intent to deceive and defraud. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).

Under PSLRA and Rule 9, at the pleading stage, a complaint must, "with respect to each act or omission…., state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." Pearce v. Duchensneau Group, Inc., 392 F. Supp. 2d 63, 72 (D. Mass. 2005) (explaining that Rule 9(b) is satisfied by an averment of "who,

---

[4] A complaint mounted upon § 10(b) of the Exchange Act or Rule 10b-5 must offer a sufficient allegation of "materiality," i.e. enough information to ascertain the significance of the misrepresentation based upon the indicated probability that the (described or omitted) event would occur and the anticipated magnitude of the event upon the totality of company activity. Basic, Inc. v. Levinson, 485 U.S. 224, 238, (1988).

what, where, and when of the allegedly false or fraudulent representation," while "other elements of fraud, such as intent and knowledge" may be averred "in general terms").  In <u>Tellabs</u>, the Supreme Court provided some shape to the previously amorphous "strong inference standard," explaining that on a motion to dismiss, a court should determine whether all of the factual allegations "taken collectively" give rise to a "strong inference of scienter," not whether any individual allegation, scrutinized in isolation, meets that standard.[5]  <u>Tallabs, Inc.</u>, 551 U.S. at 322-23.  This means a Court must also consider "competing inferences rationally drawn from the facts alleged" that support the Defendant and poke holes in the Plaintiffs allegations.  <u>Id.</u> at 314.[6]

The same required mental state of scienter applies to predictions as well.  The PSLRA adds a statutory "Safe Harbor" provision that provides for two protections.  15 U.S.C. § 78u-5.  The first Safe Harbor protection shelters forward-looking statements that are accompanied by a meaningful cautionary statement.  <u>Id.</u> at § 78u-5(c)(1)(A)(i).  The second protection prevents liability for a forward-looking statement unless the maker of the declarant had actual knowledge it was false or misleading.  <u>Id.</u> at § 78u-5(c)(1)(B); See <u>Greebel</u>, 194 F.3d at 201.  In order for predictions or looking-forward statements to be actionable in a securities fraud case, predictions must be materially misleading and made with scienter.  <u>Kirby v. Cullinet Software, Inc.</u>, 721 F. Supp. 1444, 1450 (D. Mass. 1989) (granting summary judgment where the plaintiffs failed to show sufficient evidence that the defendant's earnings forecasts were not made in good faith).  At a minimum, a prediction must be "made in good faith and with a sound historical or factual basis."  <u>Id.</u> at 1450.

---

[5] Scienter can be proven by inference derived from significant circumstantial evidence.  See <u>Greebel v. FTP Software, Inc.</u>, 194 F.3d 185, 195 (1st Cir. 1999) ().  Relevant circumstantial evidence may include, for example: divergence between internal reports and external statements, closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information, bribery by a top company official, or a quick settlement by a company of a connected lawsuit charging fraud.  <u>Greebel</u>, 194 F.3d at 196.

[6] When there are "equally compelling inferences for and against scienter," a complaint survives.  <u>Boston Scientific</u>, 523 F. 3d at 86; <u>see also</u> <u>ACA Fin. Guar. Corp. v. Advest, Inc.</u>, 512 F.3d 46, 59 (1st Cir. 2008).

     **i.  SINCE THE MISREPRESENTATIONS ALLEGED IN THE COMPLAINT ARE ACTUALLY TRUE, THEY CANNOT BE MISREPRESENTATIONS NECESSARY TO PLEAD SECURITIES FRAUD.  FURTHER, SINCE IQ MANAGEMENT AGREED TO INVEST IN BOMBER, LLC ON SEPTEMBER 25, 2012, AND EXECUTED AN AGREEMENT ON THIS DATE, ALL STATEMENTS MADE AFTER THIS DATE ARE IRRELEVANT.**

Anapolle, as Manager of Bomber, LLC, made true and accurate statements when introducing his ski business to potential investors.  True and accurate statements are not actionable and cannot be the basis for a securities fraud claim.  See Capri Optics Profit Sharing v. Digital Equip. Corp., 950 F.2d 5, 9-10 (1ˢᵗ Cir. 1991) ("indisputably true, and wholly true" statements are not actionable); see also Guerra v. Teradyne, Inc., 2004 U.S. Dist. LEXIS 28548, 26 (D. Mass. 2004) (where plaintiffs have failed to establish the falsity of statements, a claim of fraud must fail).  An analysis of the facts, look at possible reasonable inferences, and application of the legal standard outlined above, quickly dismisses and dispels all of the plaintiffs alleged misrepresentations[7] – mainly because they are all true:

**Paragraph 20**: Although normally IQ Management would perform extensive due diligence prior to purchasing a minority interest in a closely held company, Anapolle induced IQ Management to send funds before doing due diligence, because of the immediate need for capital….

1.  IQ Management's complete lack of performing due diligence is important for two reasons: (1) it necessarily shows that IQ Management cannot meet the stringent securities fraud pleading requirements because there is no supporting documentations, evidence or any tangible proof underlying or forming the basis of their allegations; and (2) it shows that IQ Management is not entitled to any relief in this action under the doctrine of *in pari delicto*- made applicable to securities fraud actions by the Supreme Court.[8]

---

[7] In this section of analysis, the heading "Paragraph #" refers to the paragraph in the plaintiff's complaint, containing the factual allegation.

[8] See Pinter v. Dahl, 486 U.S. 622 () (Adopting the *in pari delicto* doctrine in federal securities actions to preclude sophisticated investor plaintiffs who are at fault in creating the situation within which they seek remedies).

2. IQ Management, Lederman and Kallabis were and are sophisticated parties, experienced investors and bankers, and have years of experience selecting and investing in startup businesses.

3. In addition to themselves being sophisticated investors, they were represented by counsel that reviewed the subscription agreement and Bomber, LLC Amended Operating Agreement.

4. This means that when IQ Management invested, they performed no research, no due diligence, did not ask for any corporate documents or records, and on top of that, had an attorney review the securities purchase agreement and LLC operating agreement prior to investing.

5. The import of this factual allegation (which is really an admission of IQ Management's own incompetence) means that all of IQ Management's allegations of fraud, use of funds, and misrepresentations cannot be accepted as true by this Court and cannot be the basis for favorable reasonable inferences since the plaintiff is admitting they have not seen any evidence or documents to support their allegations.

**Paragraph 23**: From September 12, 2012 through October 9, 2012, Anapolle represented to IQ Management various "facts" about the past revenues and current sales in order to induce IQ Management to invest needed capital into Anapolle's company, Bomber.

6. On September 25, 2012, Lederman emailed Anapolle, and Bomber, LLC's corporate attorney, a copy of the executed agreement between IQ Management, Anapolle, and Travis Cloud (the 3 Bomber, LLC shareholders).  Exhibit M.  This agreement, Exhibit 3 to the plaintiff's complaint, was signed and executed by Kallabis, Director of IQ Management, LLC.

7.  This email is important because IQ Management executed the agreement on September 25, 2012.  Therefore, any statements or representations made after September 25, 2012 are completely irrelevant and should not be considered by this Court since IQ Management could not have relied upon them in choosing to become a member of Bomber.

**Paragraph 24(a)**: At a lunch meeting on September 13, 2012, Anapolle grossly overstated his current sales to the principals of IQ Management, Stefan Kallibis and Brian Lederman.  He stated he had approximately $300,000 in sales for the past year and this year 2012-2013, Bomber's sales would be approximately $600,000 based on existing orders, *i.e.*, double his 2012 sales.

8.  IQ Management has no idea what Bomber's sales figures are for 2012.  They have not seen sales reports, bank statements, or transaction advices evidencing or disproving these statements.  Therefore, IQ Management has no reasonable or factual basis to allege that Anapolle's presented sales figures were "grossly overstated."

9.  Aside from IQ Management's lack of knowledge or factual basis behind their allegation, Anapolle's statements were a forward-looking projections falling squarely within the Safe Harbor provisions of the Exchange Act.  Anapolle's statements were based upon his running Bomber, acting as head of sales, and, more importantly, accurate.

10. When Anapolle made these statements, Bomber was in discussions with several large multinational corporations, and expecting large orders or custom skis.  These orders were projected to be much larger than prior small-run ski orders, and Anapolle reasonably projected a large increase in sales based upon these significant forthcoming orders, and the increasing awareness of the growing company.

11. While IQ Management alleges this projection were misrepresentations, this projection cannot form the basis for securities fraud because: (1) the projection is accurate; and (2)

the projections was based on current and forthcoming sales figures and made in good

faith.


**Paragraph 24(b)**: On September 13, 2012, Anapolle also represented that he was the second cousin of one of Brian Lederman's closest friends, whose wedding, Kallibis and Lederman has just attended only days before.  Mr. Lederman's friend comes from a very affluent and prominent family from Boston and based on Anapolle's claim to being Lederman's close friend's cousin made the venture even more interesting because if he was related to Mr. Lederman's friend, chances were he was legit and honest with his statements.

    12. During the September 13, 2012 dinner, Ross Anapolle (Defendant) recognized the name

        of Lederman's close friend, because he shared the same name as Anapolle.  This person's

        last name is also Anapolle, and Ross Anapolle believes they are related either by blood or

        through marriage and have common relatives.


**Paragraph 24(c)**: On September 13, 2012, Anapolle claimed that he had graduated from Harvard Medical School and was a practicing surgeon and even claimed that he had done a surgery the week before and usually does a few each week.

    13. Ross Anapolle, DDS, graduated from the Harvard School of Dental Medicine and has

        been a practicing oral surgeon for over twenty (20) years.  Harvard Dental School is

        affiliated with and a part of Harvard Medical School.  Ross Anapolle was also a principal

        dentist and oral surgeon at Anapolle & Associates, a dental office with offices in Boston

        and Waltham, Massachusetts.

    14. This statement is entirely true and accurate.  Anapolle provided this statement to show his

        background and prior job experience since at the time of investment, Bomber, LLC was a

        fledgling start-up company.

    15. Since this statement is true and accurate, it cannot be a misrepresentation and no

        reasonable inferences in favor of the plaintiffs can be drawn from it.


**Paragraph 24(d)**: On September 14th through October 16, 2012, Anapolle claimed and reconfirmed on the 16th of October at the Mark Hotel on 77th Street and Madison Ave New York

City in a meeting with Mr. Lederman he was directly involved with the City of New York Parks and Recreations Department given that the Department was building a small ski mountain in Queens this year and next year in Central Park, and that Bomber had exclusive contract to be the exclusive provider of skis to the City.

16. IQ Management fails to plead that Anapolle's statements regarding this project and Bomber, LLC's involvement are false and were knowingly stated to deceive the plaintiff. A necessary basis for pleading securities fraud is that a statement made was false and made with the intent to deceive and defraud. Since the plaintiff does not allege this statement is false and does not allege it was made with intent to defraud, it cannot for the basis of a securities fraud claim.

17. Despite this critical failings, it is important to state that this project is real, is currently progressing, and Bomber, LLC currently has agreements in place with the City of New York to provide their hand-crafted skis for the artificial mountains being built in the city.

**Paragraph 24(e)**: On September 13, 2012, Anapolle claimed that he was about to sign agreements with New Balance and Warrior, In a meeting with Mr. Lederman on October 26th he reconfirmed these agreements which were in fact false statements, which were never signed.

18. When Anapolle had dinner with Lederman and Kallabis, Bomber, LLC was in discussions with New Balance and Warrior to produce custom skis for the large companies. In fact, during these negotiations, Bomber, LLC was creating prototypes for approval by New Balance. See Exhibit: J.

19. In fact, when asked to provide proof of these negotiations, Anapolle forwarded Ski Order Agreements, drafted by New Balance, to Kallabis so he could review the terms and have a hand in the company he had invested. Exhibit R: October 16, 2012 Email from Anapolle to Kallabis with New Balance Agreements.

20. Since these statements were accurate, and confirmed, they are not false and cannot be considered misrepresentations. Further, there is no scienter, nor is any allegation of

scienter made, since these were factual statements, made in good faith, about ongoing

negotiations with a potential large-scale purchaser.

**Paragraph 24(f)**: On September 13, 2012, Anapolle represented to IQ Management that Bomber had sold ski's to the New York Yankees, when in fact he had given 10 pairs of skis away to the Yankees at no cost.

21. During Bomber, LLC's initial marketing and advertising efforts, Anapolle and Bomber,

LLC created custom New York Yankee skis and donated them to the NewYork Yankee

Foundation, a charitable organization affiliated with the Yankees that gives back to local

charities and the Boys and Girls Club.

22. These skis were provided as promotional skis to the Yankee's charitable foundation as an

important effort to raise awareness of Bomber skis as well as Bomber's charitable efforts.

23. This statement is not entirely false, and more importantly, it is not material.  It is not

material because a small order of ten (10) pair of skis would not have been a major factor

in IQ Management's overall decision to invest in Bomber, considering the other potential

and already existing large-scale orders which were the focus of initial investment

discussions.

**Paragraph 24(g)**: Anapolle claimed he had existing orders with the New York Stock Exchange but in truth had given skis away at no charge.

24. Just as with the Yankees Foundation, during Bomber, LLC's initial marketing and

advertising efforts, Anapolle and Bomber, LLC created custom New York Stock

Exchange (NYSE) skis to promote the business and raise awareness of Bomber skis.

25. Bomber and Anapolle utilizes these promotional skis to forge relationships with

investors, and show its high-quality skis to large multinational publicly traded companies

that were potential purchasers.

26. This statement is not material because one or a few pairs of skis, in the grand scheme and overall investment picture for Bomber, would not have deterred investment or been considered relevant given the large amount of other existing and potential ski sales.

**Paragraph 24(h)**: On or about September 13, 2012, Anapolle claimed to IQ Management to have sold 200 pairs of skis to a ski shop in Austria, but had never produced any records showing the sale, invoice or collection of this sale when Bombers normal payment terms at on a 30 day basis, and therefore IQ Management is informed and believes thereon that there was no such sale.

27. This allegation is baseless and concedes that IQ Management has no factual basis or evidentiary belief for its allegation.  IQ Management is claiming that because they have seen no records directly relating to this specific sale, that no sale exists.

28. Without factual evidence or a strong reasonable belief based on actual evidence, this allegation is unreasonable and completely unsupported, and thus, cannot be considered a misrepresentation that rises to the pleading standard in a securities fraud case.

29. Aside from IQ Management's lack of supporting evidence or basis for their allegations, this representation is true and accurate.  On Bomber's website, it lists Kitzbuheler Alpen, Austria, as a Bomber Ski Dealer.  Exhibit D.  Kitzbuheler Aplen is a well-known ski resort in Austria, close to Bomber's ski manufacturer in Italy.  Kitzbuheler made a large-scale order of Bomber skis to be sold at the sports equipment shops at the Austrian ski resort.

30. Since these statements were accurate, and confirmed, they are not false and cannot be considered misrepresentations.  Further, IQ Management fails the most basic pleading standard of providing a reasonable basis and support for its belief; it fails to do so here.

**Paragraph 24(i)**: On September 13th and 14, 2012 and numerous times following, Anapolle repeatedly claimed to be the supplier or ski's for both the U.S. and Canadian ski teams, which was also false.

31. Bomber, LLC is an official ski supplier of the U.S. Ski Team.  Exhibit H.

32. Bomber, LLC is an official ski supplier of the Canadian Ski Team.  Exhibit G.

33. While it is clear that IQ Management did little to no due diligence or research prior to investing in Bomber, LLC, it is just as clear that IQ Management did little to no due diligence prior to filing its complaint.

34. Since these statements regarding Bomber, LLC's being an official supplier to Olympic ski teams is true and accurate; they cannot be misrepresentations that form the basis of a securities fraud claim.

**Paragraph 26(a)**: Prior to IQ Management's investment in Bomber, Anapolle filed a personal Chapter 7 bankruptcy on July 31, 2012, *In re Ross Anapolle*, U.S. Bankruptcy Court for the District of Massachusetts Case No. 12-16381.  To further conceal his financial condition, Anapolle failed to file the bankruptcy schedules and Statement of Financial Affairs until October 1, 2012, after IQ Management had already purchased the Bomber membership interests.  Had IQ Management been informed of the bankruptcy, it would never have invested any funds in Bomber.

35. The First Circuit has outright rejected the argument that failing to disclose a bankruptcy filing is a material omission is the basis for a securities fraud claim.  The First Circuit disagreed with the plaintiffs in Baron v. Smith, who argued that failing to disclose a voluntary bankruptcy petition was a material omission.  Baron v. Smith, 380 F.3d 49, 57 (1st Cir. 2004).  In rejecting this argument, the First Circuit reasoned that "[I]t is not a material omission to fail to point out information of which the market is already aware." Id.

36. Key to this point is § 107 of the U.S. Bankruptcy Code, providing that Bankruptcy petitions and papers filed in connection with "are public records and open to examination by an entity at reasonable times without charge."  11 U.S.C. § 107.

37. Anapolle's bankruptcy petition was and is a public record.  If IQ Management, an experienced and sophisticated investor, performed any research or due diligence, they would have discovered this fact.

38. Further any reasonable inferences in the October 1st date of Anapolle's Bankruptcy schedule filings are easily dismissed by the fact that Anapolle's Bankruptcy attorneys were preparing the schedules, and that by October 1st, IQ Management had yet to deposit funds into Bomber's account.  If Anapolle was, as IQ Management alleges, delaying in filing his schedules to deceive IQ Management, he would have waited until well after October 9, 2012, to file after receiving all of the money, not before receiving any funds. IQ Management's argument, while holding some water, is certainly not enough to plead a plausible securities fraud claim based on prior on-point First Circuit decision, as well as a thorough review of the plaintiff's complaint.

**Paragraph 35**: As of February 6, 2013, IQ Management learned that Anapolle had embezzled significant amounts of funds for his own personal use, such as lavish dinners, private school tuition for his children, and even smaller items such as paying his personal cable bill and purchasing songs on iTunes with the company debit cards.

39. This factual allegations deserves no consideration for the most fundamental reason: it provides no particular facts or evidence to support such an allegation.  In a securities fraud case, a complaint must, "with respect to each act or omission…., state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." Pearce v. Duchensneau Group, Inc., 392 F. Supp. 2d 63, 72 (D. Mass. 2005).  Simply stating "IQ Management learned…" is not nearly rising to the heightened level of scrutiny the First Circuit employs when reviewing complaints for securities fraud.

40. This factual question begs: How did IQ Management learn this?  What records did it rely on in making this allegation?  What advices or documentation does it have to support its allegation?

41. With all of these outstanding questions as to how IQ Management formed this allegation and what it relied upon, it is impossible to see a plausible claim for securities fraud. Since the complaint, and this allegation, fails to provide evidence or a reasonable basis, it falls far below the necessary pleading standard.

   **4. Plaintiff's Failure to Plead Reliance, and, In Fact, Provide Evidence of Affirmative Non-Reliance.**

The Plaintiff's action must be dismissed because it provides affirmative evidence of non-reliance, and therefore, negates a necessary element of pleading securities fraud: reliance. Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury.  Basic Inc. v. Levinson, 485 U.S. 224, 243 (1988).  A securities fraud claim cannot exists, and more importantly, cannot even be plausible for purposes of a motion to dismiss, if there is no reliance.  Id. at  224.  Justice White stated it best in *Basic*:

> Allowing recovery in the face of affirmative evidence of nonreliance –
> would effectively convert Rule 10b-5 into a scheme of investor's
> insurance.  There is no support in the Securities Exchange Act, the Rule,
> or our cases for such a result.
> Basic, 485 U.S. at 252 (White, J., joined by O'Connor, J., concurring in
> part and dissenting in part).

This Court need look no further than the Plaintiff's Complaint Exhibit 3: Amended and Restated Limited Liability Company Agreement.  Article VII: Acquisition and Transfer of Membership Interests provides:

Section 7a.  Investor Qualification Representations

> Each Member acknowledges that in acquiring his or her interest as a Member he
> is not relying on any warranty or representation, oral or written, by the Company,
> by any Manager, or by any other person or entity.  Each Member represents to the
> Company that (i) he/she is sufficiently familiar with the business of the Company
> to be able to make a knowledgeable investment in the Company, (ii) he/she is
> aware that the Company has no history of operations and is in a start-up phase
> with significant risk, and (iii) he/she is in a financial position so that his or her
> investment in the Company is not a substantial portion of his/her assets and the
> risk involved in the Company is commensurate with his/her financial position.
> Plaintiff's Complaint, Exhibit 3, Page 49 of 53.

This agreement was thoroughly reviewed, by both IQ Management with the assistance of

Counsel, and executed.  See Plaintiff's Complaint Exhibit 3: Page 52 of 53 (Signature Page).

Since reliance is a necessary element of a securities fraud claim, and by IQ Management's

admission it did not rely on any representations made by Bomber, LLC or its Manager, IQ

Management's cause of action for securities fraud under Rule 10b-5 must be dismissed.


**B.  IQ MANAGEMENT'S CLAIM AGAINST ANAPOLLE, AS CONTROLLING
PERSON, MUST BE DISMISSED BECAUSE BOMBER'S OPERATING
AGREEMENT EXPRESSLY INDEMNIFIES ANAPOLLE AGAINST DAMAGES
OR LIABILITIES RELATION TO SECURITIES LAW CLAIMS.**

IQ Management's claim against Anapolle, personally as controlling person, must be

dismissed because IQ Management indemnified Anapolle as to liability related to securities law

claims, as well as, all other state or federal claims.  When IQ Management purchased its interest

in Bomber, LLC, it executed an Amended Operating Agreement that expressly indemnifies

Anapolle personally from liability.  Specifically, the Plaintiff's Complaint Exhibit 3: Amended

and Restated Limited Liability Company Agreement.  Article VII: Acquisition and Transfer of

Membership Interests provides, in pertinent part:

<u>Section 7b.  Investment Representations</u>

> With respect to the transfer or attempted transfer of a Member's interest
> hereunder, or that of a subsequent holder thereof, each Member will indemnify
> the Company and the Manager, jointly and severally, against any damages, costs
> or liabilities, including attorney's fees, arising from or related to any violation or
> alleged violation of the Securities Act of 1933, state securities laws, other laws, or
> this Agreement.
> Plaintiff's Complaint, Exhibit 3, Page 50 of 53.

Since the Operating Agreement expressly indemnifies Anapolle personally from claims for

violations of securities fraud, IQ Management's Second Cause of Action must be dismissed.


**C.  IQ MANAGEMENT'S FOURTH CAUSE OF ACTION FOR BREACH OF
FIDUCIARY DUTY MUST BE DISMISSED BECAUSE BOMBER, LLC AND
ANAPOLLE BECAUSE THEY DID NOT PRESENT THIS DERIVATIVE SUIT
TO BOMBER, LLC OR OTHER SHAREHOLDERS PRIOR TO COMMENCING
THE ACTION.  MORE IMPROTANTLY, SINCE IQ MANAGEMENT HAS NOT
REVIEWED ANY EVIDENCE OR STATE ANY REASONABLE BASIS FOR ITS
ACCUSATION, THIS CLAIM MUST BE DISMISSED.**

In order to survive a motion to dismiss for failure to state a claim under Fed. R. Civ. P.

12(b)(6), a complaint must contain factual allegations sufficient "to raise a right to relief above

the speculative level," and in fact requires Plaintiffs to plead facts sufficient to make their alleged

conclusions "plausible."  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2008).  However,

all IQ Management alleges in its complaint is wild speculation, along with its own admission that

it performed no research, no due diligence, and hasn't reviewed Bomber, LLC records.  Without

any factual basis or evidence to raise these allegations beyond the speculative level, the plaintiffs

have fallen far short of the pleading requirements, and have failed to state a plausible cause of

action; therefore, the fourth cause of action for breach of fiduciary duty must be dismissed.

**D.  IQ MANAGEMENT'S CLAIM FOR COMMON LAW FRAUD MUST BE DISMISSED IN LIGHT OF AFFIRMATIVE EVIDENCE OF NON-RELIANCE, THUS NEGATING AN ESSENTIAL ELEMENT OF THE CAUSE OF ACTION. WHERE THERE IS NO RELIANCE, THERE CAN BE NO FRAUD.**

This Court should dismiss the Plaintiff's Count for Common Law Fraud because they cannot prove an essential element to the cause of action: reliance.  Dismissing a case or claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is appropriate when there is no plausible claim and the complaint is not legally sufficient.  Reisman v. KPMG Peat Marwick, LLP, 965 F. Supp. 165 (1st Cir. 1997).  The Plaintiff's complaint in this case is not sufficient and falls well below the standard of pleading fraud for the most basic reason: the complaint offers affirmative evidence of non-reliance in a reviewed and duly executed agreement by the Plaintiffs.  The Plaintiffs cannot claim reliance and then attach a duly executed document stating that they did not rely on any of the representations made by the Defendants.  There exists no plausible cause of action for common law fraud, and therefore, this court must dismiss this claim.

To set forth a claim for common law fraud:

> Under Massachusetts law, to establish a cause of action for fraud or deceit, a plaintiff must show that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage.  The proof of scienter in fraud cases is often a matter of inference from circumstantial evidence.  It is well settled, however, that Rule 9(b) requires the plaintiff…to specify the time, place and content of an alleged false representation.  Although a plaintiff need not specify the circumstances or the evidence from which fraudulent intent could be inferred, the complaint must provide some factual support for the allegations of fraud. Reisman v. KPMG Peat Marwick, LLP, 965 F. Supp. 165 (1st Cir. 1997) (citations omitted).

In light of the elements of a common law fraud claim, the Plaintiff's action must be dismissed because it provides affirmative evidence of non-reliance, and therefore, negates a necessary element: reliance.  Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury.  Once again, this Court need look no further than the Plaintiff's Complaint Exhibit 3: Amended and Restated Limited Liability Company Agreement.  Article VII: Acquisition and Transfer of Membership Interests provides:

> Section 7a.  Investor Qualification Representations
>
> Each Member acknowledges that in acquiring his or her interest as a Member he is not relying on any warranty or representation, oral or written, by the Company, by any Manager, or by any other person or entity.  Each Member represents to the Company that (i) he/she is sufficiently familiar with the business of the Company to be able to make a knowledgeable investment in the Company, (ii) he/she is aware that the Company has no history of operations and is in a start-up phase with significant risk, and (iii) he/she is in a financial position so that his or her investment in the Company is not a substantial portion of his/her assets and the risk involved in the Company is commensurate with his/her financial position. Plaintiff's Complaint, Exhibit 3, Page 49 of 53.

This agreement was thoroughly reviewed, by both IQ Management with the assistance of Counsel, and executed.  See Plaintiff's Complaint Exhibit 3: Page 52 of 53 (Signature Page). Since reliance is a necessary element of a common law fraud claim, and by IQ Management's admission it did not rely on any representations made by Bomber, LLC or its Manager, IQ Management's cause of action for common law fraud must be dismissed.

**E.  THIS COURT SHOULD AWARD COSTS AND REASONABLE ATTORNEY'S FEES TO THE DEFENDANTS ROSS ANAPOLLE AND BOMBER, LLC, BECAUSE THIS CIVIL ACTION IS AN ABUSE OF PROCESS, FRIVOLOUS, NEGATES THE ELEMENTS OF ITS OWN CLAIMS IN ITS COMPLAINT, AND IS NOTHING MORE THAN VAXATIOUS LITIGATION FILED IN BAD FAITH.**

While the Defendants Anapolle and Bomber, LLC rely on the legal arguments and reasoning presented in above, there is a much more sinister motivation behind this civil action which speaks directly to the Plaintiff's purpose and scheme behind filing this suit.  Just a mere three (3) weeks ago, the Plaintiff I.Q. Management submitted an offer to purchase all of Anapolle's interest in Bomber, LLC, to the Chapter 7 Trustee in Anapolle's personal Chapter 7 Bankruptcy proceeding in the United States Bankruptcy Court for the District of Massachusetts. Exhibit Q.  As pointed out by the First Circuit Court of Appeals, the courts have long acknowledged that "litigation under Rule 10b-5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general."  Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 739 (1975).  "Even weak cases brought under the Rule may have substantial settlement value… because the very pendency of the lawsuit may frustrate or delay normal business activity."  Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 80 (2006).  This securities fraud action is a flagrant abuse of the court system[9], and a desperate attempt by an bitter investor, who currently has an offer in place for the Defendant's interest in Bomber, LLC, to conjure up litigation to lower and force down the value of the Defendant's interest in Bomber, LLC.  This entire civil action is nothing more than a Neanderthal's blunt club to beat over the other interested parties' heads, and force submission and acceptance of the Plaintiff's offer for the company.

---

[9] If required to file an Answer in this action, the Defendant fully intends to submit a counterclaim of abuse of process against the Plaintiffs.

## V. CONCLUSION AND PRAYER FOR RELIEF.

WHEREFORE, for the forgoing reasons set forth above, and due to the fact that the Plaintiff's Complaint falls far below the necessary and appropriate standard for pleading it's claims, the Defendants Ross Anapolle and Bomber, LLC, do hereby respectfully request that this Honorable Court enter an Order:

1. DISMISSING the Plaintiff's Complaint and this Civil Action in it's entirety;

2. DISMISS the Plaintiff's claim for securities fraud under Rule 10b-5;

3. DISMISS the Plaintiff's claim for Controlling Person Liability;

4. DISMISS the Plaintiff's claim for Breach of Fiduciary Duty;

5. DISMISS the Plaintiff's claim for common law fraud;

6. DISMISS the Plaintiff's claims for declaratory relief: rescission, declaratory

   judgment, constructive trust, as there is no longer a federal question to establish

   U.S. District Court jurisdiction;

7. AWARD the Defendants costs and reasonable attorneys fees; and

8. Grant all other relief deemed just and proper.

RESPECTFULLY SUBMITTED,
ROSS ANAPOLLE & BOMBER, LLC,
By their Attorneys,

RICHARD N. GOTTLIEB
BBO # 547970
ALEX R. HESS
BBO # 679957
DANIELLE M. CALLAHAN
BBO# 684908
*Counsel for the Defendants*
The Law Offices of Richard N. Gottlieb
Eleven Beacon Street, Suite 325
Boston, Massachusetts 02108
Telephone: (617) 742-4491
Facsimile:  (617) 742-5188
Email: Rnglaw@verizon.net
        Arh.gottlieblaw@verizon.net
        Dc.gottlieblaw@verizon.net